CHARLES CORRETTE, Guardian of John McCulley, Appellee, v. THE UNITED PRESBYTERIAN CHURCH OF WINFIELD, IOWA, Appellant.

Conveyances: FRAUD: MENTAL INCOMPETENCY: EVIDENCE. In this action to set aside conveyances on the ground of mental incompetency, the evidence is reviewed and held insufficient to show incompetency at the time of the execution of the conveyances, or to show fraud or undue influence in procuring the same.

*Appeal from Henry District Court.*—HON. HENRY BANK, JR., Judge.

WEDNESDAY, MARCH 13, 1912.

SUIT in equity by guardian to set aside certain deeds made by his ward on the ground of mental incompetency and undue influence. There was a decree for the plaintiff as prayed. The defendant appeals.—*Reversed.*

*C. A. Carpenter*, for appellant.

*W. F. Kopp* and *Eicher & Livingston*, for appellee.

EVANS, J.—The plaintiff was appointed guardian of John McCulley in the year 1909. Within the same year he brought this action. In July, 1911, and since the entry of this decree in the court below, John McCulley died, leaving no widow or children, but collateral heirs only. Such collateral heirs have been substituted as parties plaintiff in this action. As a matter of convenience, however, the original title of the case is permitted to stand for the purpose of this opinion. The deeds under attack were executed in July, 1901, and in June, 1905. The deed of June, 1905, was intended as a correction of supposed defects in the deeds of 1901. These deeds purported to convey to the defendant all the real estate owned by McCulley, consisting of seven hundred and forty-nine acres, reserving for himself a life estate therein. This land lay in a body partly in Henry county, and partly in Louisa county, near the town of Winfield. As to the deeds of 1901, two instruments were executed in order to cover the lands in the two counties, respectively. The deeds were deeds of gift. The method adopted was intended to avoid the necessity of testamentary disposition. McCulley was never married. At the time of the execution of the first deeds in July, 1901, he was seventy-three years old. No one was dependent upon him. No particular individual had any claim upon his bounty, except so far as his collateral relatives might base such a claim upon their relationship. He had had four brothers and sisters of the half blood, and five brothers and sisters of the full blood. All of these were dead except one brother. His associations with his nephews and nieces had been very slight. Indeed, it does not appear from this record that he had any acquaintance with the most of them. This record discloses only slight

acquaintance with a few of them. Since 1897 he had given consideration to the question of what best use he could make of his property in the disposition thereof. He once contemplated leaving the same to trustees, who should be charged with the duty of renting his lands to poor people, He also contemplated the disposal of it to Monmouth College, an institution to which he had contributed more or less in his lifetime. He finally decided to give it to the defendant.

The defendant is a church organization of which McCulley was one of the organizers forty years before, and of which he was a member. For many years, however, he had not attended the church, although he had contributed regularly to its support at the rate of $200 a year. The only persons with whom he had consulted concerning his plans were Young and Hannum, two elders of the church. His conference with these had its origin in their call upon him for a proposed subscription to the proposed building of a new church. After two conferences with them, he made known his purpose, which was sanctioned, and perhaps encouraged, by them. He directed them to meet him at a specified future day at the office or bank of one Lindley. Lindley was a competent lawyer and banker, with whom McCulley was in the habit of transacting his business. On the appointed day the parties met at the appointed place. This was in June, 1901. It was discovered that the cost of revenue stamps on the proposed conveyance would amount to about $60. Thereupon the proposed transaction was postponed until July 1st, because upon such date the repeal of the law requiring revenue stamps took effect. On July 1st the parties again met by appointment at Lindley's bank. The purpose of the meeting was explained to Lindley, and he prepared the deeds, and the same were executed in his presence as notary. The deeds were delivered to the officers of the church present, and were sent for record to the respective

counties. Some weeks later one of the deeds was returned by the county recorder as having a defective description. This fact was communicated to McCulley, and he came again to the bank, and executed another deed, which, however, was made to bear the same date as the former one. In 1905 the deeds were submitted for examination to another attorney, who raised a question as to their sufficiency in form. The reservation in the deeds as drawn reserved to McCulley, not only a life estate, but reserved also the "title" as long as he should live. The opinion of the attorney was that this reservation rendered the deeds nugatory, or were, at best, only a testamentary disposition. Thereupon this discovery was also communicated to McCulley. He thereupon came again to Lindley's bank, where a new deed was drawn and executed which conformed to the criticism made upon the first deeds. This was the deed of June 3, 1905, and included all the land. This deed also was duly recorded in both counties. McCulley continued to occupy the land by leasing the same to renters, and living with the renters thereon, and so continued until his death. In December, 1908, a number of the collateral relatives met at the home of the living brother, J. P. McCulley, in Washington county, and there "decided to have a guardian appointed and try and set aside the deed so that his heirs would get the property when he died." In pursuance of this conference, proper application was made, and the plaintiff was appointed as such guardian. The plaintiff himself is one of the nephews of John McCulley. He was a resident of another county, residing eighteen miles distant from his uncle, and had not been on his place for fifteen years. At the time of this conference John McCulley was a fit subject for guardianship. He was eighty-one years old, and had suffered substantial impairment as to both his physical and mental condition. Thereupon this suit was brought as heretofore indicated.

The general nature of the proof offered by plaintiff in support of his attack upon the conveyances includes: (1) The personal examination of McCulley made by expert specialists on behalf of the plaintiff in July, 1909. Similar examination was made by expert specialists on behalf of the defendant in August, 1909. (2) An alleged change in the personal habits of McCulley and in his methods of farming and caring for his stock. This change is alleged to have occurred prior to 1900. (3) Specific instances of extraordinary conduct on the part of McCulley; also the unreasonable nature of the transaction attacked, and the preposterous magnitude of the gift undertaken thereby.

There is much diversity of opinion as between the expert witnesses on the respective sides as to the actual condition of the patient in 1909, and as to the inferences to be drawn from such diagonis.

Dr. Volding testified on behalf of the plaintiff in direct examination as follows:

I made an examination of John McCulley yesterday evening out two miles from Winfield. I examined more particularly the condition of his blood vessels. I found an *arterio-sclerotic* condition of the blood vessels, pretty well advanced, easily recognized. My judgment is that it is of a number of years' duration, possibly as far back as fifteen years. His is what I should consider a typical case of *senile dementia* well advanced. His memory as to recent matters was very poor, as to matters of long standing apparently very good. Dr. Hanna was there at the time. He didn't recognize him. He didn't know who was President of the United States or Governor of Iowa. Said he considered his land worth $45 to $50 an acre, and that he had between six hundred and seven hundred acres. Said that he had had a great number of horses in the pasture, but most of them had disappeared; that people had come there and taken them, and that he had made no effort to get them back, because it wouldn't do any good, as he couldn't locate the people who took them, and it would

simply be spending more money. The duration of *senile dementia* is from five to fifteen years.

Dr. Stevens testified for plaintiff in direct examination as follows:

I examined John McCulley at the hotel in Winfield July 26th of this year. It was apparent that he did not observe his surroundings, and he appeared not to appreciate completely the questions that we asked him. He missed a good many details. At one time he said it was the month of January and at another time it was December, and he didn't know that he was in a hotel. His memory was very poor. Couldn't tell the date of his birth, and seemed to be rather dull; his judgment being defective from the fact that he couldn't tell who was president nor who was governor. *Arterial sclerosis* means that the blood vessels are increased more or less, and hardened, so that the blood can not reach the brain cells as well as it could if there were no *sclerosis,* and from that fact the brain must necessarily deteriorate through lack of proper nourishment. The symptoms are disinclination to take up new work of any kind, and a tendency to get along in the old channels. The patient may develop some irritability and some depression, quite a number do have depressed spells. These are only symptoms of the change, and as the disease progresses the deterioration becomes greater, and the symptoms more marked. I would think that John McCulley was insane as far back as 1905. Basing my opinion solely upon the examination I made of John McCulley in July, 1909, I would say that he was insane in the summer of 1905.

The following is a part of Dr. Stevens' cross-examination:

Q. Don't there with extreme old age ordinarily come an apathy, a loosening of a man's hold on the world? A. To some extent. It is a fact there are a great many old people who are not insane who have defective memories; that is, a great many people who are within the normal class. *Senile dementia* is a gradual process of disease. *Sclerosis* of the arteries is frequently a cause. It occurs

in old age to a greater or less extent, in normal old age. It is one of the processes of nature whereby the body begins to decay. At the time of our examination of Mr. Mc-Culley we had an instrument to determine the blood pressure. It was applied to the upper part of the arm, and connected by a rubber band to the arm, and we can determine the blood pressure by the reading of the instrument which records the operation of the pulse. That instrument indicated that Mr. McCulley's arteries were occluded, and that his heart was working hard, and was enlarged. The enlargement of the heart was caused by the *arterial sclerosis*. It was one effect of nature's efforts to overcome this *sclerosis*. There was a cardiac murmer that indicated that the valves of the heart were leaking. That was owing to the enlargement of the heart, the valves didn't meet. Q. There is no way by which you can measure the progress of *senile dementia?* A. Only by your experience of cases, and the symptoms which you learn concerning the case under consideration. Q. You can't just tell when it begins, can you? A. You could not fix the absolute minute. Q. Because the effect is remarkably small at the start? A. It begins ordinarily very gradually, but if there is a specific cause like syphilis, or alcoholism, you might stamp it a little more accurately. Q. Did you find any evidence of alcoholism about Mr. McCulley? A. No, sir. Q. Or syphilitic taint? A. No, sir. Q. Or any lesions of any kind? A. No, sir. Q. Did you make a urinal test? A. Yes, sir. Q. You haven't given that? A. No, sir. In the urinal examination we found a low specific gravity 10.15. There was pussy cells in the urine, and some urates, but no albumen and no casts. There was nothing in the examination to indicate a serious disorder of the kidneys, except that it might indicate there was probably some *arterial sclerotic* kidneys. This is a condition which happens quite frequently in old age. Q. I presume there is a stage when *senile dementia* first begins, and that it progresses for some time before it can be observed. A. Yes, sir; I think in the beginning it must progress to some extent before you can notice it. Q. You would not call it *senile dementia* in the sense of insanity, until it had quite an effect? A. Most old men will deteriorate some, of course. Q. Where the *senile dementia* begins obscuring

a man's mind, does it ever produce what you might call instant evidence of insanity, or does the obscuration come on with increasing tendency? A. It does not increase suddenly, but the evidence of the mental disorder would increase with the progress of the disease, which may have existed during a long time. Court: During that period would he be reasonably sane? A. That would depend, again, on the other acts. Q. Are there often times and periods during which a man who has incipient *senile dementia* has reasonable periods? A. In the incipient stage he could do a great many things. As the disease progresses he would be correspondingly less able to do things. I have seen cases that have lasted ten years, but the average is about from five to seven years. It might be, if there was no excitement, the case would go on quite awhile without much deterioration. It would be impossible in a particular case to tell the period of duration. I did not pronounce Mr. McCulley a complete imbecile. He knew his name and about what his age was, and that he lived on a farm, and that he owned between seven hundred and eight hundred acres of land, and that he was born in Ohio. He understood when we asked him to disrobe a part of his body for examination. I discovered no hallucinations nor any delusions at that time. His hearing was somewhat defective, and he could not see very well. He didn't know where he was. We asked him how he came to town, and he said that he rode in. He said his land was worth $7,000. The main causes of *arterial sclerosis* are age, alcoholism, and syphilis, sometimes overwork. There was no evidence of alcoholism or syphilis in this man. He appeared to be a hard-working man. It is hard to tell what to ascribe it to in this case. We know it comes with old age, probably old age has something to do with it. Q. I am asking you to give medical opinion on what you found. Do you ascribe it as occurring from old age in this man? A. No, sir. Q. Did you ascribe it to alcoholism? A. No, sir. Q. To syphilis? A. No, sir. Q. Do you find *arterial sclerosis* without mental disturbance? A. It has happened. Q. It can be and is often found? A. I won't say it is often found. There have been cases where there have been considerable *arterial sclerosis* without any mental disease. Q. Isn't it rare to find extreme old age in a person that

don't have some *arterial sclerosis?* A. Extremely old people always have some *arterial sclerosis.* We could not say that as a rule *arterial sclerosis* is followed by mental disturbance. It is quite probable that normal old age often develops into *senile dementia* very quickly. The indicies of *senile dementia* are distinct from normal old age, and are as follows: There will be a greater degree of memory failure, I mean for passing events, and greater apathy as to the things a man normally takes notice of. Weaker and more impaired judgment, failure to initiate original work, and a more yielding will power. The things that I have enumerated are simply differences in degree.

Dr. Applegate testified for plaintiff in direct examination:

Dr. Stevens and I made an examination of Mr. McCulley at the hotel in Winfield on July 26, 1909. It was in the room used as the parlor, and he was seated in a chair. We were introduced to him, and asked him a few questions, and then began the physical examination of the man. I first noticed that he was old and anæmic. By anæmic I mean that he was rather pale, his face and hands. His lips were blue, and his muscles were flabby and soft. I also noticed that his teeth were bad; that his hair was rather spare, not a great deal of it, not a great quantity of hair; that his pupil reaction was sluggish to light; that there was some tremor of the tongue and of the hands; that he was slightly deaf in the right ear; that there was a right inguinal hernia; that on his left leg, just above the ankle, there had been a bone broken, the outer bone, or fibula, the smaller bone, and that seemed rather disfigured. There were some varicose veins in the limb, and a scar denoting an injury below the knee of the left leg. His sensory system showed there was some increase in the reflex action, particularly of the legs. There was some swaying motion when he would stand erect, and, when he would stand erect with his eyes closed, he could not do so without moving to one side or the other, weaving from one side or the other. His sensation over the body generally was somewhat impaired, and there was slow response on the soles of the feet, to which we applied the instrument which we use for testing sensation, and in the test of his

blood pressure it was found to run between one hundred and seventy and two hundred, which showed high tension, and an examination of the pulse showed that every sixth or seventh beat would be missing. It would beat six or seven times, and then there would be a missing beat. The pulse was rather hard and prominent, showing high mitral tension, which was proven by the instruments which were used in examining the arterial tension, and the arteries of the wrists and of several parts that were examined showed hardened mitrals, showing somewhat extended *arterial sclerosis.* There was distinct mitral murmur. The heart didn't act in a proper and normal manner, and there was emphysema of the lungs. There was a slight hacking cough, which the old gentleman exhibited during the examination. The skin covering the chest was loose and flabby, and the appearance of the body would lead one to believe that he was at one time a larger and more muscular man. He was somewhat stooped, and there had been considerable wasting of muscular tissues, showing that he had failed physically. I was introduced to Mr. McCulley as Dr. Applegate, and he shook hands with me, and in offering my hand he grasped my hand, and then he sat in a chair, and I asked him a few questions at first, such as asking him where he had come to, or what town he was in, and when he came, and I think his answer was that he came 'some time this afternoon.' I asked him his age, and he said that he was eighty-two years of age. He volunteered no information, and I continued to ask some questions. I asked him how he felt, and he said he felt tired, and I asked him if he had been a hard-working man, and he said, 'Yes,' he had worked all his life, and I asked him if he had pretty good health generally, and he said, 'No,' that he felt bad. He said that he had a good deal of pain in the back of the head, and he put his hands to the back of his head, and I asked him whether he had any dizzy spells, and he said he did. He said at times he felt dizzy and had to sit down. I asked him how far he lived from the town, how far his home was from the town. He first said— He studied a little while, and said it was a mile and a half, and I asked him that same question a short time after that, within ten minutes I should think, and he said he believed it was four miles, and I asked him

who was President of the United States, and he said he didn't know, and I asked him what month of the year it was, and he said— He studied some little time. His answers were all retarded, and not infrequently I had to repeat the question, and sometimes failed to elicit an answer. He said that he believed—when I asked him the month of the year—he said he believed it was December; and then I said: 'Is that why you are dressed as you are, because you think it is December?' Is it because you think it is December that you are wearing the kind of clothes you do? Is that the reason why you wear a heavy duck coat,' and the kind of a plaid jacket or jumper that he had on; and he had on corduroy trousers and heavy felt boots, or boots of felt and rubber. They were felt boots with rubber over them, and he said, 'Well,' he was cold. This was quite a warm day in July. I asked him if he thought it was December, and he said that he didn't know; and I asked him if he had not seen some farmers harvesting and plowing corn on his way to the city and he said he didn't know; and I asked him whether he had ever seen anybody harvest and plow corn in December, and he said he didn't know, they might have harvested and plowed corn in December; and I asked him if he ever harvested any in December, or plowed any corn, and he said that he didn't know. He was badly demented. He was not of sound mind. He was suffering from *senile dementia*. It was well advanced. Judging from my examination of the man, and the marked advanced state of the *arterial sclerosis,* and the extent of it, I think the *arterial sclerosis* has extended over a period of not less than fifteen years.

On behalf of the defense two expert specialists testified to a personal examination of the patient made in August, 1909. Dr. Littig testified in direct examination as follows:

Saw John McCulley this morning. Had a little conversation with him, and made an examination of his arteries and heart. His arteries are thickened, and the condition is one which is usually called *'arterio-sclerosis.'* His arteries are slightly more than normal, not extensively. I examined the arteries at the wrist and at the forehead

and at the side of the elbow. Found very slight *sclerosis* in the arteries at the temple. Q. What connection has *arterio-sclerosis* and insanity and *senile dementia?* A. Well, since *senile dementia* occurs chiefly in old people, and since *arterio-sclerosis* is a disease that is rather common in people of advanced life, a fair percentage of the same suffer from *dementia* because they have *arterio-sclerosis.* Q. What percentage? A. I can not tell you. Q. Tell whether a large number of people suffering from *sclerosis* have no *dementia?* A. I know of an immense number, in fact, it is very common in a good many people who have marked *arterio-sclerosis;* yet those men continue at their usual occupation without any manifestation of insanity or *dementia.* The duration of *senile dementia* is generally given as from three to five years. From my examination of Mr. McCulley with ordinary care, I would think he was good for two or three or five years. I met him in the house. Noticed his gait as he walked toward the house; came along at a brisk gait. I didn't see him carrying a cane. He had no assistance in getting into the house. I asked him a few questions, and he made a few remarks about the weather, that it was quite a sudden change, or something of the kind. Then I asked him if he knew the road to Mt. Pleasant, and he said it had been quite a long while since he had been there, and he did not think he could tell me just what road to take; and I then said, 'How far is it?' and he said about fifteen miles, and I said, 'Directly south?' and he said, 'No; it is about six miles west.' I asked him how far it was to Wapello, and he said it was about fifteen miles practically east. Then I asked him about Washington, which he said was north and west, and the distance was given as about seventeen or eighteen miles. Then I asked him how much land he had, and he said about seven hundred acres or a little more; and I asked him about the land, and he said there was no land that was any better. I asked him if he owned the land, and he said, 'Yes,' that he did own it, and that he didn't own it; and then I said, 'What do you mean by that?' He said, 'Well, I have given it away.' He stated that he had given it to the church. I then asked him if he had no relatives who needed this land, and he said that he had spoken the matter over with his brother

James, and that James was perfectly willing, and had told him that he thought it a good plan to give it away. I asked him if he didn't have any nephews to do for who needed it, and he said his nephews were provided for, and that it wasn't wise to give a young fellow too much money. He said the best thing he thought was to give it to the church, and that he had done this a number of years ago. I think he said that his brother James didn't need it. Dr. Grimes said something about there. being some litigation about the deed, and he said that he didn't understand that, that he thought he had the right to dispose of his property as he thought fit, that he had done this a number of years ago, and he thought he had sufficient brains at that time to do as he thought best. He said he didn't see well, but I did not test his sight. I think this was practically all that was said. He wanted to know the result of the examination of his arteries, and wanted to know the result of the examination of his heart. Of course, we told him that his arteries were in good condition, and his heart was all right. That was to cheer him up. He seemed to be about in the condition that we would expect a man of his years to be in, and perhaps a little better. I should say that he was about in a normal condition of mind. He was not specially cheerful, and he was not melancholy.

Dr. Hill testified on direct examination as follows: "I saw John McCulley on August 9, 1909, and made an examination of his arteries. I found a moderate degree *of sclerosis,* I mean arterial degeneration. I concluded that he had a moderate amount of *arterio-sclerosis,* but no more than I would expect to find in a man who is eighty-one years old."

On cross-examination he testified:

The examination I made of John McCulley was on the 9th of August of this year, 1909. In my opinion Mr. McCulley is not of sound mind now, and was not at the time I made the examination. At that time he was suffering from *senile dementia.* I did not examine his arteries with an instrument; that is an accurate way of

making the examination. It is perhaps the most exact way of determining the blood pressure. I fix the average duration of *senile dementia* at about five years. There are a few longer ones and a great many shorter ones which make the average. I could not tell from the examination of a patient afflicted with *senile dementia* how long it had continued without a history of the case. I did not conclude that Mr. McCulley was demented a great deal, only as to his memory and want of orientation. He had no delusions or hallucinations. I heard his deposition read here in court, and would not regard his answers as indicating an advanced state of *senile dementia*.

All the foregoing witnesses testified also in response to hypothetical questions. Each party had framed a hypothetical question which was propounded to the various witnesses. The hypothetical question presented by each party was so framed as to compel the desired answer, even from the adverse witnesses, *nolens volens*. We find little help from the answers of expert witnesses to the hypothetical questions. Although the plaintiff introduced some evidence in support of every alleged fact included in his hypothetical question, it is nevertheless true that many alleged facts are included therein which can not be deemed as fairly established upon this record, as will be indicated to some extent later herein. It does, however, appear from the expert evidence that in the summer of 1909 the patient was suffering to a greater or less degree from *senile dementia;* that this was a progressive disease; that it was due to an impoverishment of the brain, resulting from a hardening of the arteries. No delusions or hallucinations were discovered by any of the experts, nor was there any cause ascertained for the hardening of the arteries, except old age. *Arterial sclerosis* is said to have some prominent specific causes, as distinct from mere old age. None of these specific causes was found in the patient. There was no kidney trouble and no lesions. Upon this diagnosis the experts for the plaintiff expressed the opinion that the

disease had existed for more than ten years. Those on the part of the defendant contended that this would be improbable. At this point the views of the defendant's experts impress us as the more plausible and probable. It may be said at this point that the deposition of McCulley was taken in July, 1909, and the same has been incorporated into the record, and is before us. Further reference to it will be made later.

We will turn now to the consideration of some of the evidence relating to the farming methods and personal habits and particular conduct of McCulley. At this point a little further history must be stated. John McCulley was born in Ohio in November, 1827. He came with his father's family to Iowa about the year 1838, where the father owned several hundred acres of land. The father died in 1858. John received from his father two hundred acres of land either by will or conveyance. This was the land which included the buildings, and he continued to occupy the same down to the time of his death. For a few years before his father's death, he farmed in partnership with his brothers. Later he farmed alone, keeping hired help. From time to time he acquired additional land in small tracts successively, paying for one before he bought another. Most of such land was purchased at $6 or $7 or $8 per acre. The last purchase was in 1899, and consisted of forty acres at a purchase price of $1,000. His sister Rebecca kept house for him until she died in 1895. Of the seven hundred and forty-nine acres then owned by him about four hundred acres was tillable farm land, and the remainder was pasture and woodland. The evidence estimates the value of the land in 1901 at about $50 per acre. It appears, also, that the market value has increased very substantially since that time by the general rise in the price of farm lands. He raised considerable stock, including horses, cattle, and hogs. He made something of a specialty of small road horses, and kept sires and

many brood mares for many years. In the fall of 1899 or spring of 1900 he rented his farm for a period of five years to his nephew, J. P. Dawson, who came upon the place with his family, and with whom McCulley lived during the tenancy. It was during this tenancy that the first deeds were made to the defendant in 1901.

Dawson was a witness on the trial on behalf of the plaintiff. A considerable part of the plaintiff's hypothetical question to his expert witnesses was based upon the testimony of this witness. The direct examination was as follows:

Am sixty-one years of age. Live in Columbus Junction; a farmer. Lived on the John McCulley farm near Winfield from the fall of 1899 to 1905. John McCulley is my uncle. There is seven hundred and forty-nine acres in the whole farm. The first year I undertook to farm all of the land except forty acres. There was about four hundred acres of farm land. My three boys, John, Wally, and Roy, helped me. John and Roy are still living. My wife is still living, and was with me on the farm. During the first winter I was there Mr. McCulley had some stock of his own. He hauled straw for them, sometimes out of an old straw stack, that was more than a year old, and wasn't fit for feed at all. He would sprinkle salt on it. The stock seemed to look for the salt, but didn't eat very much of it. He also fed some fodder. Fed this all on the ground. McCulley had something like eighty head of horses, and during the winter he kept them in the stalk field. After the stalk fields were used up he kept them in the timber pasture. He never stabled any of them or put them in a shed. He had a stallion there the first winter, and kept him in a lot where there was no cover or shed of any kind. There was a high fence around the lot. He threw some feed in there, and that was all that kept the stallion out of the mud. He fed him fodder on the ground; threw it over to him. He had a box in there and fed grain in it, and had an old kettle in there to put water in. Sometimes he would throw some corn over the fence. Q. What did he tell you he was going to do with it? A. He led the horse out of the lot, and started down with

him, and said he was going to cut his throat with a pen-knife. He said he chose to kill him that way; that he had killed them that way before, and it was just as well as any other. I afterwards found that horse out in the hog lot, but didn't examine to see if throat was cut. When I first went there in 1899, the house was in very poor condition. He had a room west of the kitchen that had in it almost everything you could speak of or think of. He slept on a lounge in the kitchen. After we threw the lounge out, he slept in a bed. In the room we found dried halibut which smelled very strong, and some old lard in jars, and a lot of old butter that was in a butter bowl without any cover, and some old overalls and some old clothes, harness, pitchforks, old shoes, curry combs, shirts, and pants. My wife told him we were going to clean out the room. He thought she could get along without it, but she said she couldn't, so we went to work and cleaned it out. He would heat a stick of stove wood, and take it to bed with him. Sometimes the stove wood would be charred. My wife said that soapstone would be better, but he thought he would stay with the wood.

The first year I farmed there was in the spring of 1900. I put in some corn. He didn't want me to plow very deep. He wanted me to plow just as shallow as I could, and said it wasn't necessary to plow deep. I said it ought to be plowed deep enough to cover the shovel, and he said that was not necessary; that it was a waste of horse flesh. There was twenty-eight acres that he thought was good enough to plant without plowing, just to scatter the grain over the ground. I told him I didn't think that was the best way to do, but I planted it without plowing; planted it over the old corn rows with a planter. After it was planted we harrowed it. The corn on that ground was not very good, but it was better than I expected. He told me it was just as well to sow oats without harrowing or cultivating, but I did not sow them that way. When I sowed them the other way, he did not say anything to me. Q. When you were cultivating your corn, what did he say to you about which way you should cultivate it? A. There was fifty-two acres he claimed was too crooked to cross it. He wanted to plow it the same way three times, but it was not too crooked to cross. He went out

and plowed it himself the first spring. He used a mule team, and had a great deal of trouble with it. They would get tangled up, and we would have to stop and help. The harness would get tangled, and he couldn't turn around right. He bred the mares, the yearlings. He would tie them to the fence and let the horse out to them. He would quit maybe for a day or two, and in a short time would be at it again. It is not proper to breed a mare a year old. I first saw this a short time after I went there. I have seen him tie his horses to a fence and whip them with a cattle whip until they would be all in a lather of sweat, marked all over nearly. My sons and myself stopped him from doing this. He had a sick spell the first season I was on the farm. It was along in January. He fell off a load of straw, and was knocked unconscious, and laid him up a week or ten days before he got around. He had no doctor. Later that year he fell off a horse in the pasture. It was a gentle horse, one of my own. He fell backward. I couldn't see that the horse did anything. I was a little ways off. He said that the horse stumbled. He complained about being hurt after the fall off the horse, and was quite feeble. I do not think he had a doctor. He complained that he had been hurt in the back of his head; of pain in the back of his head. He complained of this all the time I was there, and I heard him complain of it a few days ago. He wore a big, plush cap in the summer as well as the winter. Q. Did he tell you why he wore the cap? A. He said he wanted to keep his brain warm. He wore felt boots part of the summer time. After his fall from the horse he had dizzy spells, would stagger around, and catch hold of something. He had several of these. They didn't last very long.

He had three other stallions while I was there. Bought one at Winfield of Mr. Mills; paid $2,000 for it. He kept this stallion in the same lot as the other except the draft stallion, and we had a shed fixed for him. He put a partition through the lot. He kept them in the lot in the winter time; fed the same as the others, fodder and corn. He throwed the feed over the fence, and once in a while threw some feed in the box. His other stock were pretty thin. Some of them died. They apparently died from starvation. Q. Did you ever say anything to Mr.

McCulley on this subject? A. We told him he ought to feed more, but he didn't think they needed it. He did feed after the second winter more than we did before that. We lost horses every winter while I was there; lost them from exposure and want of feed and shelter, but that wasn't all the reason. We lost some from stock diseases. Mr. McCulley made a good many horse trades while I was there. I saw him buy an old black mare for $85 from a man who had bought her for $15. The mare was old and heavy. He bought a great many blemished horses and traded for blemished horses; traded for old horses that had ring bones and other troubles. Sometimes there would be three and four men per day come there and trade with him. I remember Ury Beecham, Clyde Beecham, and Dr. Harrison coming there. Mr. McCulley was sick about a month one fall when I was there. That was about a year after I went there. He had no doctor. I know that he was ruptured and wore a truss. The truss was a piece of rough board fastened to a leather strap with a screw. The board was something like an inch fence board, three or four inches square. It was fastened with a screw to a leather strap which went around his body. I spoke to him about getting a better truss. He said that was the best truss that was made; that he had tried others. I remember of him burying a cow one time over south of the road. He just dug down deep enough to bury the body, and left her legs sticking up. He didn't have screen doors on the house when we went there. He said that he didn't want his air strained, and that they were in the way, and he wouldn't get any. We had to watch him all the time while we was there to get him to change his clothes or to bathe. I always had to bathe him, especially when he would be crippled up. He bought a stallion from Oscar Wilson for $400. I wouldn't consider it worth over $200. He kept no book account for these stallions, and his memory was very poor. He carried his money and generally his notes in his pockets. I found the notes once out in the field, and returned them to him.

The first transaction I had with McCulley was about a bill of sale. It is on record. It was for household goods, mules, corn, hay, and a cow. That was after I lived there a short time. It was October 13, 1900. I had

no other transactions with him after that, when I bought a half interest in his horses, cattle, and hogs. That was by written bill 'of sale, and is on record. I recollect after that when the assessor was around, and he and I and the assessor were together talking about his property, McCulley wanted to give in 'all the property as his own. I told him I owned a half interest in it, and he said I didn't, but insisted on giving it all in. I 'think that was in the spring of 1902. Ed. Neal was the assessor. Once when I called Mr. McCulley to dinner, and he seemed to hear me, and I went to see where he was, he was out in the barnyard. When he didn't come, 'I went and took hold of him, and said, 'Dinner is ready,' and he said, 'Oh,' and came on along in. I had conversation with 'him about his memory. He told me he felt so bad some days that he didn't know what he was doing. There would be sometimes that his head would be hurting him badly. That was the following winter after we moved there. I don't think the 'dizzy spells from the effects of his fall lasted more than two or three weeks. After this he would sometimes be very blue and more irritable than he was before. He saw an advertisement for Doan's Kidney Pills, and told me to get some, and I got a half dozen boxes. He had no doctor at that time. He complained of his kidneys bothering him. 'When we came there he was wearing felt shoes, and continued doing so while we were there. Our partnership in the stock continued until I left. We just divided the stock. I told him 'to take his first choice, and we ran through it that way. I gave him the choice to take the best ones or the ones he wanted. 'I tried to divide it as near equal as we could. I was helping him and my boys some.

The foregoing will serve as sufficiently illustrative of the evidence relied on. The record is very voluminous, and it is not practicable to 'include even the substance of it in an opinion. The theory of the plaintiff is that there was a marked and noticeable change in the conduct 'and habits of McCulley at and prior to this time. We have gone through the record with much care, 'and we are unable to discover therein any convincing evidence of any

marked change in the habits and conduct of McCulley at this period, leaving out of consideration now specific instances of extraordinary conduct. What little evidence there is in the record as to the past methods and habits of McCulley, it is quite undisputed therein that he was never a model farmer or stock raiser. On the contrary, his methods appear to have been slovenly and inefficient. He never housed his stock. The hedge rows and the woods furnished them their only shelter. His premises were untidy. His method of feeding his stock was to throw feed upon the ground. It does not appear that he ever fed in any other way, or that he ever erected a hayrack or a feeding box upon his premises. His stock was often in poor flesh.

Emphasis is laid upon the fact that he directed his tenant to plant corn in last year's cornfield without ploughing the same. This was acceded to by the tenant, and with better success than he had expected. He advocated, also, shallow ploughing and the ploughing of his ground in ridges for drainage purposes; and yet it appears without dispute that this was his method of farming thirty years ago. The same may be said of his plan to sow oats upon unploughed ground. His method of feeding his stock by throwing the grain upon the ground and into the mud was quite in keeping with the past. His usual method of travel was on horseback, usually riding a small pony. The fact that he should thus ride through his cornfield in search of cockleburs, and that he should carry a hoe for the purpose of cutting such cockleburs as he might discover, was not greatly indicative of mental aberration, if the cockleburs were "few and far between." Throughout the tenancy of Dawson, McCulley was almost daily engaged in working about the place. At the close of the tenancy a full settlement was had between them, which involved all the stock upon the place; McCulley having previously given to Dawson a bill of sale for one-half of all the stock. When Dawson left, eighty head of horses were

left upon the place as the property of McCulley. The cattle had been sold. In the settlement with Dawson, McCulley represented his own interest, and, so far as appears, he did it intelligently. After Dawson's departure two other tenants occupied the place jointly. After the expiration of this tenancy, a third tenant occupied the same. These tenants were all witnesses on behalf of the defendant. Their testimony presented a very different picture of McCulley from that of Dawson. As to the instances of extraordinary or exaggerated conduct on the part of McCulley, as testified to by Dawson, they are not satisfactorily proved. As to some of this testimony, not only on the part of Dawson, but on the part of some other witnesses, we see manifest inconsistencies, and we are impressed that there was quite as much exaggeration in some of the testimony as there was in the conduct of McCulley.

It is made to appear that after the death of his sister Rebecca in 1895 he never went to church. But it is made to appear, also, that he had been delinquent in that respect for many years prior thereto. His brother testified as a witness in behalf of the plaintiff that he had reproved him for such delinquency twenty or twenty-five years ago. His excuse was that he was not worthy of the communion service. He does not appear to have had any grievance against the church or its members, and he continued regularly in his contribution to its support. For many years he had complained of neuralgia in the head and neck. This also was his excuse for not attending church, and this, too, was his excuse for wearing a plush cap summer and winter. In 1897 he broke one bone of his left leg, the tibia. This was his excuse for wearing felt boots ever after. It is urged that the gift was preposterous in its magnitude, and was therefore unreasonable, and that this is a circumstance indicating mental unsoundness. This fact seems to have had great weight with some of the expert witnesses, although it was quite outside the realm of their special

knowledge. That the gift is one of great magnitude is self-evident. Whether it was unreasonable depends upon the other circumstances of the case, and upon the point of view. From McCulley's point of view, he gave nothing in the present tense. He reserved to himself the use and enjoyment of all his property during life. That was the best he could do in any event. Of all his father's family only one brother was left. He, like himself, was an old man, and without any need of aid so far as appears in this record. The problem confronting McCulley was to make some disposition of his property that would devote it to charitable and benevolent uses after his demise. He was compelled to choose between some such plan on the one hand, or, on the other hand, to permit his property to be scattered by statutory descent among numberless nephews and nieces. It does not appear that he ever sustained affectionate relations with any of them. Neither does it appear that there was any hostility on his part toward them, further than that he was not satisfied with Dawson nor with another nephew who lived with him preceding Dawson. Therefore, under the undisputed circumstances surrounding McCulley, we do not think it can be fairly said that the disposition made by him was preposterous, unreasonable, or unnatural.

Considerable evidence was introduced as to transactions subsequent to 1905. We will not deal with the details of these. They were not material except so far as they might reflect back and throw light upon conditions antedating June, 1905. These relate largely to a number of horse trades which were made by McCulley, and whereby it is alleged he was greatly cheated. These were mostly made in 1907 and 1908. Before December, 1908, all his horses except twelve or thirteen had disappeared. The horse trades which were testified to in this record do not account for their disappearance. In the fall of 1905 he had on the place one hundred and five horses, and ap-

proximately this number seems to have continued until 1907 or 1908. The intimations of the record and of the arguments are that they were largely stolen.

As we read this record in all its bearings, we are convinced beyond all fair question that the deeds in question were executed by McCulley with intelligence and deliberation, and after thorough consideration, and that they were in accord with his final and abiding wish. Whatever else he afterwards forgot, this purpose abode with him to the end. Reference has already been made to his deposition which was taken and used in evidence in this case. It disclosed great impairment of memory and of a knowledge of present things. He could not name the President of the United States nor the Governor of Iowa nor the month of the year, but he knew his age and knew the personal events of his life and testified to them. His deposition also discloses that he knew that he had conveyed his land to the defendant, and that he still desired to stand by it.

We quote the following from his direct examination:

Q. How much land have you got, Mr. McCulley, in acres? A. I can't tell you, but the deeds will show it. Q. About how much? A. Something like seven hundred acres, or a little over. Q. How long have you had that land? A. That I can't tell you, but I have had it ever since the land was—I believe it was $7, $6 or $7 when I got it. Q. What was the last piece of land that you bought? A. That I can't tell you. Q. Did you buy it or was some of it given to you by your parents? A. Oh, my parents gave me some, the start. Q. Now, do you recollect of making a deed to the United Presbyterian Church for this land, subject to your life use of it? A. I do some, I believe. Q. Do you recollect making a second deed in order to straighten up some defect in the first one? A. Well, I remember something about that, too, but not— Q. Now, how did you come to make; that is, what reason did you have, or how did you come to make this conveyance to the church? A. Well, sir, I just thought that this property I had to give it to someone or another, and I thought that

was the best place I could put it.   Q. Have you any children?   A. No, sir.   Q. Was you ever married?   A. No, sir.   Q. Have you any near relatives living anywhere near you here that are dear to you in any way?   A. My brother lives at Washington.   Q. Did you ever have any talk with him about making that kind of conveyance of your property?   A. When I done it?   Q. Yes, sir.   A. Yes; he said it was the best thing I could do.   Q. Which brother was that?   A. Jim.   Q. Do you recollect the men that you first talked to about making this deed to the church, Ed. Young, do you recollect him?   A. Oh, yes.   Q. And Mr. Hannum?   A. Yes.   Q. Were they the first men you ever talked to about making the deeds?   A. Oh, that I can not tell.   Q. You recollect Mr. Ed. Young, do you?   A. Yes.   Q. Now, I want you to tell me, Mr. McCulley, whether or not it was Mr. Young's suggestion that you make this deed to the church, or whether it was your own idea?   A. I think it was my own idea.   Q. State whether or not he did anything to induce or persuade you, or tried to get you to make this deed against your wishes?   A. No, sir; he did not do that.   There was nobody done anything of that kind. They helped me to get ready.   Q. What is your feeling about the matter now, as to whether you want this deed to stand or be set aside?   A. What do I want to set it aside for?   Q. I am asking you to state this so that I can present this matter to the court; as to your wishes about the matter.   A. I want it to remain as it is.   I don't want to be made a boy of.   I done this with my own good will.

We quote also from cross-examination:

Q. What did Ed. Young say to you about this land? A. Oh, I couldn't tell you that, either.   Q. What did he ask you to do with it?   A. Why, I believe he said it was the best thing I could do, if I remember.   Q. He told you to give it to the church to use as long as it was a church, didn't he?   A. Yes.   Q. And that the land would stay together?   A. Yes, sir; yes.   Q. All the time?   A. Yes; they was to use it to their best advantage.   Q. They were not to sell it, were they?   A. No, sir.   Q. Who else talked to you about this besides Ed. Young?   A. Oh, I couldn't tell you that.   Q. Quite a number of others?   A. Yes, yes. Q. And they told you that the church would use the land,

didn't they? A. Em-phem (meaning 'yes'). Q. And that the church would never sell it? A. That is what—that was my impression. Q. How many deeds did you make for the church? A. How? Q. How many papers did you sign for the church? A. That I can't tell. Q. How many do you think you signed? A. I couldn't tell you. Q. Do you know who was there when you signed the papers? A. I don't remember that either, I don't think. If I had marked them down, I could have told you. Q. Who wrote the papers for you? A. I can't tell you that. Q. Who brought the papers to you to be signed? A. Well, I can't tell you that. Q. Do you remember when the paper was made? A. I just couldn't tell you when that was done either. Q. About how long ago was it? A. Well, sir; I don't believe I could tell you that. Q. Ed. Young told you that it was the best thing to deed this to the church, did he? A. He thought so. Q. Mr. Hannum told you the same thing, did he not? A. Yes, sir. Q. Did the minister of the church tell you that, too, at that time? A. Tell me — Q. The preacher told you it was the best thing, didn't he? A. Well, I couldn't tell you that. Q. You don't know? A. No, sir; I don't want to tell you things that I don't. Q. Are you a member of the church? A. I have been. Q. I mean are you a member of this Winfield congregation? A. I have been. Q. You are not now, are you? A. Well, I don't know. I haven't been there for a long time. Q. You haven't been there for twenty years, have you? A. No, sir, I haven't. I haven't been well in my head and neck. I have had the neuralgia in my head and neck, and I didn't feel it would do me any good to go to church. Q. Your name is not on the church roll now, is it? A. I expect not. I don't know. Q. The preacher doesn't come out to visit you now, does he, as one of his members? A. I don't remember that he has. Q. What is your land worth? A. Oh, I couldn't tell you that. Q. What do you think it would be worth? A. I am just like a boy. I couldn't tell you anything about that. Q. Have you no idea what your land is worth? A. It used to be worth a little, and now it is worth a good deal. Q. Well, now, how much is it worth now? A. I don't know what land is selling for. Q. How much did it used to be worth? A. About something near $7,000. Q. Was that

what it was worth when you gave it to the church? A. Well, now, I can't tell you that. Q. What did you think it was worth when you made the deed to the church? A. But it was worth something near the same then as it was when I let them have it. Q. You didn't let them have it when you made the deed, did you? A. Yes; I let them have it when I— Q. At that time you think it was worth about $7,000? A. Something near that. Q. What is it worth now? A. Well, I just couldn't tell you. Q. You are living on the place now, aren't you? A. I am living on the place. Q. Are you living alone? A. No, sir; I .have got a man. Q. Who is the man who lives with you? A. Paisley. Q. How many acres of land is there now? There was about seven hundred acres of land when you gave it to the church? A. I guess there is just about the same. Q. The same now as there was then? A. Yes, sir; I don't know of any of it being disposed of. Q. You don't know of the church selling any? A. I don't think they have. Q. They have no right to sell it, have they? A. Why, I don't think they would. Q. The only right they have in it is to use it as long as the church is here, isn't that it? A. Yes, sir. Q. How many papers did you make to the church? A. I couldn't tell you that. Q. It was only one, wasn't it? A. —. Q. It was only one? A. I dont' remember more than one. Q. You only remember of one? A. Yes. Q. Do you remember where you made that? A. I do not. Q. Who made that paper? A. Lindley, I guess. I rather think it was. Q. And the paper that Lindley made is the one that you remember, is it? A. Yes, sir; that is all I remember. Q. Who was it told you it was the best thing to deed this property to the church? A. That I can't tell you. Q. Did any of your relatives tell you that? A. —. Q. Did any of your relatives tell you that? A. My brother Jim, when I told him I had done it, says he: 'It is the best thing you could have done with it.' Q. Didn't James tell you it was a mistake to have done it? A. A mistake? Q. Yes. A. No, sir; he did not. Q. You told James that you were giving them the use of the property, didn't you? A. I just told him how I done, and says he: 'It is the best thing you could have done.' Q. What did you tell him? How did you say you had done it? A. I don't

remember it. You want to get too much out of me. I don't see as I need to tell all such stuff as that. Q. No; you don't need to, but wouldn't you just as soon tell me? A. Why have I got to tell you as I think I ought to? Q. I will not misuse it. I will not misuse the information. A. I don't keep everything fresh in my mind. Q. You don't know now what you told James, do you? A. I told James— Q. You don't remember what you told James, do you? A. No. Q. Where was James when he told you it was the best thing? A. I forget whether he was at home or here. I couldn't tell you that. He was on the place here. Q. It was on the place? A. Yes, sir; I can tell you that. Q. What do you want done with your land when the church gets through with it? A. Why, I want to put it to the best advantage for the church. Q. For the church? A. Yes, sir. Q. But suppose the church quits being a church here at Winfield, then what do you want done with it? A. Well, I hope there will be still some people somewhere— That I don't believe is necessary either. Q. You mean necessary, how? How is it not necessary? A. Why, your questioning me about that, when it is a thing that ain't any benefit. Q. But you were telling me you wanted the church to have the property? A. Well? Q. Now, suppose there is no church, suppose the church quits being a church, what do you want done with the property then? What would you like to have done with it? A. I think they have brains enough to use it to the best advantage. I think they will. Q. Who will have brains enough? A. I suppose that there will be some of them left in the church then. Q. You want those people left in the church, then, to take the property? A. Yes, sir. Q. Then, if the church ever quits, then you want the people who are left of the church to have the property at that time? A. Yes.

We will not pursue further the details of the evidence. The foregoing must be sufficient to indicate its salient features. It is a very small part of a large record. Our conclusion is that the evidence in this record will not justify a finding of mental incompetency neither in 1901 nor in 1905. Nor can it be said upon this record that there

was any fraud or undue influence practiced upon McCulley. We think, also, that the contrary of both of these propositions is affirmatively made to appear.

Our view of the evidence renders is unnecessary that we enter upon any discussion of the authorities cited in the careful briefs of counsel.

The decree entered below must be, and it is, *reversed*.