KATIE FLYNN et al., Appellants, v. EMMET MOORE, Appellee.

DEEDS: Validity—Mental Infirmity—Unbelievable Traits of Character—Effect. The fact that the grantor in a deed had been shockingly cruel to his wife, was a hermit, starved himself from choice, and not from necessity, possessed unspeakably filthy personal habits, and entertained beliefs unbelievable to an ordinary mind, does not necessarily show that he was incapable of understanding in a reasonable degree the nature and consequences of his business transactions.

DEEDS: Consideration—Support for Aged Grantor. The recognition of past kindnesses and an agreement by grantee to care for the grantor for the remainder of his life may furnish adequate consideration for a deed to property of large value, though the financial consideration be wholly inadequate.

DEEDS: Validity—Undue Influence and Fraud—Burden of Proof. A grantee in a deed, executed wholly without grantee's instigation,

though largely in the nature of a gift to grantee, does not have the burden, no fiduciary relation appearing, to show that the deed was free from fraud and undue influence.

**DEEDS:** Consideration—Failure of Consideration—Support and Care.
4  An obligation on the part of a grantee in a deed to care for the aged grantor is fully met by furnishing such care and comforts to the grantor as he, in view of his abnormal and desired way of living, is willing to receive.

*Appeal from Emmet District Court.*—D. F. COYLE, Judge.

DECEMBER 11, 1917.

SUIT in equity by the heirs of Thomas Maher, deceased, to set aside a conveyance of 80 acres of land, and to quiet title thereto. The court dismissed plaintiffs' petition and entered judgment against them for costs. From this judgment, plaintiffs appeal. The facts are fully stated in the opinion.—*Affirmed.*

*Byron M. Coon* and *S. G. Bammer*, for appellants.

*Morse & Kennedy*, for appellee.

1. DEEDS: validity: mental infirmity: unbelievable traits of character: effect.

STEVENS, J.—I. Thomas Maher died testate November 6, 1915, at the age of 94 years, seized of a tract of something over 100 acres of land in Emmet County. He was survived by two daughters, the appellants herein, and several grandchildren, as his only heirs at law, all of whom are named as beneficiaries in his will. He was twice married, but both of his wives were deceased long prior to his death. The appellant Mary McSweeney is a daughter by his first marriage. On April 27, 1911, he executed a will by the terms of which he bequeathed $200 for mass; a like sum for a tombstone; $1,000 to the Catholic Church of Estherville; $100 to a Norwegian Protestant church located near his residence; $200 to St. Mary's Academy, at Quincy, Illinois; $2,000 to each of his two daughters; and the residue of his estate to his children, grand-

children, and Jerry Flynn, his son-in-law, share and share alike. The will was filed and admitted to probate without objection. On October 11, 1912, he conveyed to appellee the north half of the northeast quarter of Section 11, Township 98, Range 33, and to Andrew Rokne the southeast quarter of the northwest quarter of Section 11, Township 98, Range 35. The consideration expressed in the deed to appellee was $250. The deed to Rokne is not set out in the abstract, but the consideration therein appears, from the evidence, to have been $500. On the 28th of the same month, deceased, appellee, and Rokne entered into a contract in writing as follows:

"State of Iowa, Emmet County, ss.:

"This agreement entered into between Thomas Maher, party of the first part, and G. E. Moore, party of the second part, both of Emmet County, Iowa, to wit: In consideration of $250 paid by the party of the second part to the first party, and the farther valuable consideration that the second party has for the last 10 years or more befriended, cared for in sickness, that the second party has cared for the first party as a child to parent and that the second party farther agrees to care for, nurse and provide for the sickness as in health for the first party, during the lifetime of the first party. In consideration of aforesaid valuable consideration and other considerations not herein mentioned, the first party has this day deeded to the second party, his heirs and assigns, the north half of the northeast quarter of Section eleven (N½ of NE¼ of Sec. 11), Twp. 98, Range 33, to be holden by the second party to himself and his heirs forever. To my two living daughters, Mrs. Jerry Flynn and Mrs. McSweeney, I expect to give my personal property, about $3,500, consisting of cash and certificates of deposit. To Andrew Rokne I expect to give the southeast quarter of the northwest quarter of Sec. 11, Twp. 98, Range 35, since said Andrew Rokne has also befriended

me, and assisted with G. E. Moore in nursing and caring for me in sickness and in health and paid me in cash $500 in further consideration. The remainder of my property consisting of about 100 acres of land I have willed and bequeathed for various purposes as provided in said will. Dated this 11th day of October, 1912, in Emmet County, Iowa."

The contract was dated back to correspond with the date of the deed, but it is admitted that same was not in fact executed until the 28th of October, 1912, the date on which same was acknowledged. Two or three days after the execution of the deed above referred to, deceased moved to the home of appellee and resided therein for several months, when he returned to his own home and remained for a considerable period. In the meantime, appellee erected a small house on his premises near his residence, in which deceased thereafter resided alone.

The grounds for setting aside the deed to the 80-acre tract, and upon which plaintiffs pray that title be quieted in them thereto, are as follows: (1) That at the time of the execution of said deed deceased was a person of unsound mind; (2) that the consideration for said conveyance was wholly inadequate; (3) that same was induced by appellee by the exercise of undue influence; and (4) that there was a failure of consideration.

Principal reliance is placed by appellants upon their contention that, at the time of the execution of said instruments, deceased was not possessed of such mental capacity as to comprehend and understand the nature and consequences thereof. No medical testimony was offered upon the trial, and it therefore does not appear of what physical ailment deceased was at the time suffering. It is conceded that he was ill, and, on the day preceding or the day on which the deeds were executed, summoned a priest from Estherville, who administered the sacrament to him. No

physician was, however, called to attend him. Appellee and Rokne came to see him, and the deeds were executed at the request of deceased, and, so far as appears from a careful reading of the record, without previous knowledge upon their part of the intention or desire of deceased to convey the above respective tracts of land to them, and without solicitation or inducement upon their part. At the time the priest visited him, deceased requested him to notify appellee and Rokne that he desired to see them, and gave him directions where they might be found. At the time of the above transactions, deceased resided in a filthy hovel on his premises on the banks of a small lake, and the priest testified that his bedding, clothing and person were so extremely filthy and dirty that he appeared not to have washed his face or hands for many years. To sustain plaintiff's claim that the deceased was at the time of unsound mind, evidence was offered tending to show the extremely filthy surroundings in which deceased lived and his long-established habit of personal uncleanliness; that about 30 years before his death he was extremely brutal and unkind to his wife, who, on account thereof, separated from him, and moved, with the children, to Estherville; that upon one occasion he inflicted upon her such severe physical injuries and became so violently angry that she went out in the woods and remained for several days; that upon her return he manifested no interest in her condition nor regret for his brutality, and refused to call a physician to attend her or permit her to use a team to go to town for the purpose of consulting a doctor. He was penurious and close in financial matters, and shortly after he separated from his wife began talking to his friends and neighbors upon religious subjects, claiming that he was not a worldly, but a spiritual, man, that he would live until his flesh fell from his hands; often expressed a desire to be crucified, and one witness testified that he requested him to get a sharp ax

and cut off his head; claimed that God had revealed to him that chairs had spirits, and that the world was going to be destroyed. Other peculiarities of mind and eccentricities were testified to by some of the witnesses, but the above are the principal facts detailed touching his mental condition. He lived as a hermit in his hut on the banks of a lake, but it is not shown that he did not possess average capacity to understand and carry on and transact ordinary business.

Upon the occasion when the priest visited him, he apparently believed he was about to die, and gave to the priest $1,000 to be given to one of his daughters and $1,900 to be given to the other. He requested him to transmit these separate amounts to the daughters named. The priest did so, at the same time informing the daughters of their father's condition. Upon the following day, they visited him, and, when called as witnesses herein, testified that he recognized them; that he was very feeble, and apparently could not live very long. They remained with him for about an hour, then returned to their homes at Rock Valley, and neither of them saw him again for many months. They apparently made no inquiry as to his condition for several weeks and received no reply to their inquiry for months, but they did not visit him until as above stated. Several witnesses called on behalf of plaintiffs detailed conversations with him relating principally to matters above stated, and expressed the opinion that he was of unsound mind. Other witnesses called on behalf of appellee expressed the contrary opinion. At the time of his illness he gave some bees to a neighbor, but, when he recovered, demanded and was paid $12 therefor. He was at one time the owner of an old corn planter, which witnesses testified was wholly worthless, but which he claimed to have improved by removing some of the necessary parts therefrom, and he offered to sell same for $10 and refused to take less. But few other business

transactions are referred to in the evidence. When he and his wife separated, he deeded her one third in acreage of the 320 acres of which he was then possessed, but included therein 21 acres of practically valueless swamp land. He was in no wise related to either appellee or Rokne, and the conveyance to them of the respective tracts above described appears to have been induced by the feeling upon his part that appellee had been kind and helpful to him in his old age, and when ill, and that he desired to be nursed and cared for by these friends during the rest of his life. Apparently he had become, to a considerable extent, estranged from his children. They went with their mother at the time she separated from deceased, and never thereafter resided with him, but occasionally visited him. It is claimed by them that they often requested him to either live with them or permit some of them to live with him, but this he declined. The scrivener who wrote the will testified that he gave all directions therefor, naming his children and grandchildren. He declined to receive food and clean bed linen from the priest, and often stated that he could and did fast for weeks at a time, and it appears from the evidence that he required and ate but very little food.

To justify the court in cancelling the deed to appellee and quieting title to said land in plaintiffs, we must find from the evidence that the mental powers of deceased had so far deteriorated or been destroyed by age, disease or physical weakness that he was incapable of understanding in a reasonable degree the nature and consequences of the transactions complained of. *Nowlen v. Nowlen,* 122 Iowa 541; *Corrette v. United Pres. Church,* 154 Iowa 383; *Altig v. Altig,* 137 Iowa 420; *Mathews v. Nash,* 151 Iowa 125; *Swartwood v. Chance,* 131 Iowa 714.

It has been repeatedly held by this court that a contract or conveyance cannot be avoided upon the ground of insanity, where the evidence shows only that grantor was suscep-

tible to illusions, hallucinations or delusions respecting matters not affecting or relating to the subject of the contract or conveyance. He was a member of the Roman Catholic Church, and apparently much devoted to its principles. The priest testified that upon the occasion of his visit Maher repeated some very beautiful prayers, which he had evidently learned many years before, and other witnesses testified to similar acts upon other occasions. His capacity to comprehend and transact ordinary business does not appear to have been in any way affected by his apparent belief in his ability to receive revelations from God, or his peculiar religious experiences. His often-expressed desire to be crucified was not mentioned by him to the priest, and to other friends who frequently visited him he said nothing of such wish. That his mind had undergone some deterioration, due to his advanced age, and that he may have desired to die, is probable, but that he was mentally incompetent to recognize and understand his duties to those having claims upon his bounty, or to form a rational and intelligent purpose or wish to execute the deeds in question, in recognition of past favors and in consideration of future care and nursing, is not shown by the evidence. He appears to have been mentally rugged for one of his age, except for the certain peculiar beliefs and eccentricities above referred to; and we cannot say, from the matters shown, that the conveyance in question was the result of an unsound mind. Plaintiffs have not shown. that deceased was incapable of transacting business intelligently at any time, nor are any improvident transactions referred to by the witnesses. It is our conclusion upon this point that deceased was of sound mind and wholly capable of transacting the business in question. We have carefully read the entire record, and, while we have not referred to nor reviewed herein all the evidence relating to his mental condition, we have considered same in reaching the conclusion above expressed.

II.　The land in question was worth at

2. Deeds: consideration: support for aged grantor.

the time from $5,000 to $6,000. Of course, the small payment of $250 was wholly inadequate; but the conveyance, as evidenced by the contract in writing, imposed upon appellee the necessity of providing care and nursing for the old gentleman so long as he should live. He was taken to the Moore home, notwithstanding his filthy condition, and lived with them in the house for many months; and that he was cared for and looked after so far as he was willing that appellee should do so, satisfactorily appears from the evidence. He lived for nearly 3 years after the deed was executed. Appellee built a small house for his use and paid therefor. The contract recognized past kindness, the extent or character of which is not shown, nor was any evidence offered to contradict this statement in the contract. Whether the services rendered by appellee were a fair equivalent for the land we are unable to say, but that the transfer thereof brought to him the care and nursing which he desired, as well as such methods of life as were suited to his condition and desires, is doubtless established by the evidence, and we do not feel that this cause should be reversed upon the ground of inadequacy of consideration.

III.　There is no direct evidence of un-

3. Deeds: validity: undue influence and fraud: burden of proof.

due influence on the part of appellee. It is argued by counsel that the relations between the parties were such that the burden rested upon the defendant to show that the transaction was bona fide and free from fraud or undue influence. The rules stated in the cases cited by counsel are well understood, but they are not applicable or controlling in this case. It does not appear from the evidence that appellee at any time or under any circumstances suggested to deceased that he convey the land to him or to Rokne, or that

any inducement whatever was offered to him to do so. The first suggestion, so far as appears in the evidence, that deceased desired or intended to make said conveyance, was when he requested the priest to notify the parties, and summoned them to come and see him. The witnesses who were present upon that occasion, some of whom appear to be men of intelligence and wholly disinterested, testified that the transaction was in accordance with the wish expressed at that time by deceased.

Without further discussion or elaboration of the evidence, nothing appears in the record tending in any way to sustain plaintiffs' claim that there was any effort made by appellee to induce deceased to make the conveyance.

IV. It is also contended by counsel for appellants that the consideration for said conveyance failed. It is claimed that deceased was neglected and not cared for by appellee or his family; that he lived alone in the small house near appellee's residence, surrounded by unspeakable filth; that his bedding and person were permitted to become filthy; that no screens were placed upon the window or door; and a granddaughter of deceased testified that she visited him upon one occasion when he was lying in bed covered with flies, and that his bed and clothing were dirty. The evidence does not show what effort, if any, was made by appellee to care for and nurse deceased or to provide for him clean and sanitary surroundings; but, in the absence of testimony that he was actually neglected by appellee, it may be assumed that he preferred the surroundings in which he lived to those which were more comfortable and attractive. He had spent the latter part of his life, at least, in filth, neglecting to even wash his hands and face for years. He resided upon the premises of appellee until shortly before his death, when he was removed to a hospital in Estherville, where he soon thereafter died.

4. Deeds: consideration: failure of consideration: support and care.

It appears that the expenses of the hospital and medical attendants during the time he was at the hospital were paid by appellants and that appellee declined to pay the same, but the evidence is meager on this point. It is also claimed that during the time he lived on the premises of appellee he went without food, but this was doubtless in accordance with his desire, and, perhaps, belief that he could live upon very little sustenance. He preferred to fast, and the efforts of his friends, including the priest, were unavailing to induce him to desist therefrom.

We have carefully examined the record in this case, with a special reference to each ground relied upon by appellants for reversal of the judgment of the trial court; and, while the evidence shows many eccentricities and peculiarities of deceased, we reach the conclusion that the court rightly dismissed plaintiffs' petition and taxed the costs to them, and the judgment is—*Affirmed.*

GAYNOR, C. J., WEAVER and PRESTON, JJ., concur.