NELLIE R. CAVANAGH, Guardian, Appellant, v. FRANK A. O'CONNOR et al., Appellees.

**ATTORNEY AND CLIENT: Fiduciary Relation.** An attorney may
1 not be said to hold a fiduciary relation to another simply from the fact that, at a time *prior* to a deed in question, the attorney had performed legal services for the grantor.

**DEEDS: Mental Weakness.** Mental weakness sufficient to inval-
2 idate a deed must be such as to render the grantor incapable of understanding in a reasonable degree the consequences of his act. Evidence held insufficient to justify the setting aside of the deed of an aged grantor.

*Appeal from Chickasaw District Court.*—A. N. HOBSON, Judge.

DECEMBER 14, 1918.

REHEARING DENIED MAY 21, 1919.

SUIT in equity to set aside and cancel certain deeds and other instruments. The facts are fully stated in the opinion.—*Affirmed.*

*R. Feyerbend* and *Lodge & Brown,* for appellant.

*Smith & O'Connor* and *D. D. Murphy,* for appellees.

STEVENS, J.—In April, 1915, E. T. Runion, who was then about 93 years of age, executed two warranty deeds, conveying his real estate, consisting of a residence property in New Hampton, Iowa, and a 480-acre tract in Texas, to the defendants O'Connor and Kennedy; and about the same time, and as a part of the same transaction, a trust agree-

ment and a bond in the sum of $5,000, binding defendants O'Connor and Kennedy to the faithful performance of the terms thereof, was entered into between the above-named parties, designating defendants as trustees to manage and dispose of the real property conveyed, together with certain personal property, including about $500 on deposit in the First National Bank of New Hampton. This suit, which is prosecuted in the name of Runion's guardian, was brought to obtain a cancellation of the above-named instruments. The grounds upon which this is sought are that same was obtained by fraud and undue influence, practiced upon Runion by the defendants and others at a time when he was of unsound mind, and while confidential and fiduciary relations existed between O'Connor, who is a practicing attorney, and Runion.

The deeds are in the usual form of warranty deeds, and acknowledge a consideration of one dollar and other good and valuable consideration. The trust agreement is somewhat lengthy, but the following is the part thereof material to this controversy:

"It is further agreed that second parties shall hold the legal title to the land above described, free from any trust limitations, with authority to sell and convert the same into cash as soon as they shall deem it expedient to do so, the intention being to authorize and direct such sale and conversion at the earliest moment consistent with good business judgment; and second parties are hereby authorized and empowered to convey said property to any purchaser or purchasers thereof, free from the terms and limitations of this trust, and without any appraisement, order of court, or other restrictions of any kind.

"It is further agreed that second parties, as trustees, shall, out of the funds or proceeds arising from the sale of said property, pay over to first party the sum of $1,000 for such special purposes and use as first party may desire to

make of same, and shall pay all indebtedness owing by first party at this time, including any mortgages against any of said property; that said second parties, as trustees, shall hold the remainder of said funds in their hands for such time and purposes as are herein.provided; and so long as said property or the funds derived from the sale thereof remain in the hands of the second parties under this agreement, second parties agree to hold same in trust, and from said property or funds or from the income therefrom, to provide first party with all necessary board, lodging, clothing, washing, and laundry, nursing, medical attendance, and a nominal amount for pocket money from time to time, so long as he shall live, and to furnish him a proper and respectable burial in case of his death; all the remainder of said property or the funds derived from the sale thereof shall be devoted to hospital purposes as hereinafter provided.

"Second parties are hereby authorized to apply proceeds from the sale of said property in whole or in part, or the property itself (so far as same may remain unsold), to aid the said Servant Sisters of the Holy Ghost in the erection of a hospital in New Hampton, Iowa, and in the purchase of a proper site therefor; provided, however (if first party be living at said time), that, before any of said property or funds shall be used for hospital purposes as above provided, said Servant Sisters of the Holy Ghost shall first legally obligate themselves by written contract to continue to furnish first party all necessary board, lodging, clothing, washing, and laundry, nursing, medical attendance, and a nominal amount for pocket money from time to time, so long as he shall live, and to furnish him respectable and proper burial in case of his death; and said contract shall provide that first party shall be assigned a suitable and comfortable room in said hospital."

Defendant Servant Sisters of the Holy Ghost is an Illinois corporation, having its principal place of business at

Techny in that state, where it owns and conducts an Old Folks' Home and hospital. The Servant Sisters are also engaged in the business of erecting and conducting hospitals. Some months prior to the execution of the several instruments in question, a committee, of which defendants O'Connor and Kennedy were members, undertook to raise a certain amount of money in New Hampton to aid the defendant corporation to procure a site and erect and conduct a hospital in that city. The deeds and trust agreement were executed after some negotiations between Runion and the defendants. No actual fraud or misrepresentation is claimed or established by the evidence. The testimony offered to prove the alleged confidential or fiduciary relation between O'Connor and Runion covered substantially the following transactions:

About the year 1897, O'Connor, at the request of Tim Donovan, a banker residing in New Hampton, of whose bank Runion was a customer, after one consultation with Runion, prepared a will for him, which was later signed in O'Connor's presence. Again, in 1910, Runion desiring to have a new will, Donovan for him employed O'Connor to write it, and in 1912, Donovan employed the firm of Smith & O'Connor to make defense for Runion, in an action brought against him in the district court of Chickasaw County. After some delay, and when the case was about to come to trial, it was settled by Runion by paying plaintiff $500. The settlement was made upon the advice of his attorneys. But two conferences were had between O'Connor and Runion during the pendency of this litigation. All of the above matters were fully closed before the transactions in question arose, and no business relation existed between O'Connor and Runion at that time, except that the latter was still indebted to Smith & O'Connor for $100 attorney fees.

The relation of attorney and client is necessarily one of

great trust and confidence, and imposes upon the former the
duty to deal with the latter in all respects in the utmost
good faith. *Morrison v. Smith,* 130 Ill. 304

1. Attorney and
   client:
   fiduciary
   relation.

(23 N. E. 241) ; *State v. Johnson,* 149 Iowa
462 ; · *Shropshire v. Ryan,* 111 Iowa 677 ;
*Donaldson v. Eaton,* 136 Iowa 650 ; *Ryan
Bros. v. Ashton,* 42 Iowa 365.

In the case at bar, no such relation is shown to have
existed, at the time the instruments were executed.  Just
when the relation terminated is not shown, but O'Connor
was in no wise employed by or acting for Runion at the
time of the transaction complained of.  That clients often
repose a high degree of confidence in attorneys formerly em-
ployed by them is, of course, true, but the transactions be-
tween them cannot be set aside upon that ground.  The
papers in question were prepared by Mr. O'Connor, but
specific provision is made in the trust agreement that he is
to receive no personal profit or benefit therefrom.  But it
is the contention of counsel for appellant that, while the
evidence of alleged fiduciary relations between O'Connor
and Runion may not justify the cancellation of the deeds
and trust agreement upon that ground alone, yet, when con-
sidered in connection with other matters appearing in the
record, the transaction is so ill-advised, improvident, and
unfairly obtained that it should be set aside.  No substan-
tial evidence from which it could be reasonably inferred
that any of the defendants exercised undue influence over
Runion is found in the record.  Runion testified to some ef-
fort upon the part of defendants to encourage him to make
the conveyance by flattery, but no false representations or
inducements are shown to have been made.  Whether the
transaction was a wise one for Mr. Runion is a question up-
on which minds reasonably might differ, but this cannot
be made the basis of a decree canceling and setting aside
the instruments assailed.  No close personal relations are

shown to have existed between either of the defendants and Runion.

The Servant Sisters of the Holy Ghost is a Catholic organization, and Mr. Runion, some time after his marriage to a Catholic woman, became a member of that church; and, while the evidence tends to show that he may not always have been prompt in his attendance upon church services, it does appear therefrom that he read the Bible and prayer book, occasionally received the sacrament, and in one of the wills executed by him, $100 was left for masses. Some weeks elapsed after the negotiations for the conveyance of his property began before the papers were executed. During this time, several conferences were had with him by defendants. It is conceded by counsel for appellant that no actual fraud is shown, and that the defendants are men of large business experience and integrity.

The remaining question for our consideration relates to the mental competency of Mr. Runion. As before stated, he was about 93 years of age, and, some 15 years before the matters in controversy arose, as the re-

2. DEEDS: mental weakness.

sult of an injury received while in Texas, one of his legs was amputated, and he walked by the aid of crutches. He was uneducated, but able to read and write his name. He had resided in New Hampton most of the time since shortly prior to 1869, when he dedicated a block of land in said city for a public park. He also sold the lot upon which the Catholic church is situated to that organization, and subscribed $100 to aid in procuring an organ therefor. He appears to have been a strong partisan in politics, and at one time owned a newspaper in New Hampton, which was managed and edited for him by a man by the name of McKee.

Many years before this controversy arose, he became involved in some unfortunate real estate speculations in Alabama, and, for the purpose of aiding him to save some-

thing therefrom, a guardian was appointed for him, but the guardianship was later removed. His wife has been deceased for more than 20 years. He boarded with friends in New Hampton, whom he paid therefor. He was without children, but had a sister and several nephews and nieces residing outside of this state, with whom he had not, however, been associated, except with one niece for a few hours, for about 20 years. The total net value of his property is variously estimated at from $6,000 to $15,000. After the papers were executed, he was taken by defendants to St. Anne's Home, at Techny, Illinois, at which place he remained until removed by plaintiff; and, in a letter written by him to the defendant Kennedy, he expressed contentment and satisfaction with his care and surroundings. He was induced to leave the home by plaintiff, who is his niece, and other relatives, and taken to Detroit, Michigan, where plaintiff was appointed his guardian. The only income from his property was $10 per month rental for the residence and $50 per year for the rent of the Texas land. He testified as a witness in his own behalf, showing rather a remarkable recollection of the transactions involved, and, apparently, a clear comprehension and understanding of the purpose and legal effect of the instruments executed. The trial judge, now deceased, was a man of mature years and long experience upon the bench, and, we gather from the record, had known something of Mr. Runion for a long time. The trial lasted for several days, giving the court an opportunity to observe his appearance and conduct, as well as the remaining witnesses and parties to the suit, and some weight must be given to its conclusion. The court, in passing upon the evidence, said:

"Mr. Runion was a witness in plaintiff's behalf, and submitted to an extensive oral examination by the attorneys. He displayed an unusual strength of memory and acquaintance with the facts in controversy. He showed a

keen intelligence relative to the subject of the litigation, and answered promptly and intelligently questions propounded to him, and even indulged in witticisms on occasions, which were in keeping with the matter inquired about."

Mere mental weakness in the grantor will not invalidate a deed. To have that effect, the mental powers must be so far deteriorated or destroyed that the grantor is incapable of understanding, in a reasonable degree, and knowing the consequences of, the instrument he executes. *Nowlen v. Nowlen,* 122 Iowa 541; *Swartwood v. Chance,* 131 Iowa 714; *Paulus v. Reed,* 121 Iowa 224; *Reese v. Shutte,* 133 Iowa 681; *Flynn v. Moore,* 181 Iowa 1163; *Mitchell v. Mutch,* 180 Iowa 1281.

Only acts tending to show some degree of childishness upon the part of Mr. Runion were shown, and it does not appear that his mental faculties were impaired to such an extent as to render him incapable of exercising a free agency, or of comprehending and understanding the scope, purpose, and legal effect of the instruments executed. We find nothing in the record indicating that any of the parties connected with the matter were moved to any extent by questionable motives. Transactions of the character shown, with old people, often prove unfortunate; but, in the absence of some recognized ground of equitable relief, they cannot be disturbed. We have not overlooked the contention of counsel that, upon the execution of the papers, they were delivered to the defendant Kennedy for safe-keeping; but, as the deeds recited a consideration only of one dollar and other valuable consideration, and did not designate the grantees as trustees, it appears to us that the defendants, who, it is conceded, are men of integrity, were personally interested in the preservation of the trust agreement. They must have realized that they would some time be called upon to show the real consideration for the conveyance.

The trust agreement should be carried out strictly in accordance with its terms and spirit. Before any part of the property, or proceeds received from the sale thereof, is turned over to the Illinois corporation, ample security should be furnished by it for the faithful carrying out of the agreement with Runion. His interests in the transaction are paramount to all others, and must have first consideration, and the funds should be first used to provide for him a comfortable home and all reasonable and necessary care, nursing, and attention while he lives. From what is said above, it follows that the decree of the lower court must be, and is,—*Affirmed*.

PRESTON, C. J., WEAVER and GAYNOR, JJ., concur.