WILLIAM A. GERNHART et al., Appellees, v. CLARENCE HARVEY GERNHART et al., Appellants.

**DEEDS:** Validity—Mental Incompetency. Evidence bearing on the mental incompetency of an aged grantor reviewed, and held sufficient to invalidate the deed in question.

*Appeal from Woodbury District Court.*—C. C. HAMILTON, Judge.

DECEMBER 13, 1921.

REHEARING DENIED SEPTEMBER 30, 1922.

ACTION in equity to set aside a warranty deed conveying certain real estate in Woodbury County, Iowa by reason of the alleged mental incompetency of the grantor at the time of the execution thereof. The trial court sustained the petition and declared the equities of the cause to be with plaintiffs. Defendants appeal.—*Affirmed.*

*O. D. Nickle,* for appellants.

*Jepson, Struble & Anderson, J. A. Berry, A. C. Hatt,* and *Fred S. Berry,* for appellees.

DE GRAFF, J.—This appeal presents fact questions only and for this reason we are not inclined to incumber this opinion with an extended or detailed recital of the facts and circumstances contained in the record.

On April 11th, 1919 Willis H. Gernhart executed a warranty deed, for a consideration. of $1.00, purporting to convey 240 acres of land situate in Woodbury County, Iowa to Clarence Harvey Gernhart. The grantor died intestate February 12, 1920 and left surviving him as his sole heirs at law his sons and daughters, plaintiffs herein and the defendant Margaret Jane Reynolds.

The senior Gernhart was 85 years of age. He had been a fairly steady drinker of intoxicating liquors and at times used same to excess. He had been married twice and the plaintiff William was the only issue of the first marriage. His second wife divorced him. After he left the farm he boarded and roomed for several years in hotels and rooming houses in Sioux City and on May 1st, 1914. he began living at the home of Mrs. Mary Folan in Sioux City where he remained until April 7, 1919. He left the Folan home because he was asked to pay 50 cents a week more for his room. The true name of the grantee in his deed is Clarence Malloy. He changed his name by legal process in Nebraska at the request of the grantor and for the purpose of having the changed name appear in the deed. Subsequently to the change he did not use his new name and in the later correspondence between him and the senior Gernhart the name Clarence Malloy was used. Although there were no conditions attached in the deed the grantor continued to treat the farm as his own and told his tenant that he would have the first chance to rent it for the ensuing year. He also told a realtor in Sioux City subsequently to the execution of the deed that he owned the land and listed it for sale. He wasn't sure just what the sale price was but mentioned $250 per acre. Prior to visiting the farm with the agent on the following day he said the land was worth $300 per acre and that he had been offered that price for it. In June 1919 Gernhart told a Mr. Lawrence of Sioux City with whom he had been acquainted for 50 years that he owned the land and would sell it for $300 per acre. The fact that this deed had been executed to Clarence Malloy alias Gernhart was never mentioned by him to anyone. In the latter part of the year 1919 he told another close friend of his that he intended to give this farm to his two sons. The deed in question is one of several attempted dispositions of the land.

In 1916 he executed a deed to his son William. This deed was kept in his possession until January.1918 when he destroyed it. At the same time he destroyed his will in which he had devised the land to William. Shortly thereafter he executed another will in which he devised his property equally among his children, but the grantee in the instant deed was not mentioned. Later he executed another deed conveying the land to his grandson Oliver Gernhart, son of William, and he made mention of this fact to others. Just before Christmas in 1918 Oliver visited his grandfather at Mrs. Folan's home where he was then rooming and on this occasion he asked the boy to remain all night with him. Oliver replied that he could not do this as he had promised his mother that he would return home and assist her in picking geese for the Christmas market. At this time neither the boy nor his parents knew anything about the deed having been executed in Oliver's favor. A few days later Gernhart made mention of the fact of his invitation to the boy to remain all night and taking the deed from his pocket handed it to his son-in-law Campbell asking him to read it. After reading it Gernhart said he was going to destroy this deed and that ''those geese would be the dearest geese that boy ever picked.''

About a month later at the Campbell home Gernhart burned the deed and repeated what he had said to Campbell on the first occasion and ''chuckled.'' In July 1919 he. told his tenant Frisbie that his grandson Oliver was a fine boy and that he (Gernhart) was very much like him when he was young and said that Oliver was the only grandson he had and he intended to give the farm to him. Upon the death of Gernhart the defendant grantee went to the farm, told the tenant that he (Malloy)' owned it and that he had paid $50,000 for it. The deed did contain $50 in revenue stamps, but these stamps were not on the deed when it was executed at the attorney's office. The grantee is the son of the defendant Margaret Jane Reynolds by former marriage to John Malloy. Mrs. Reynolds was married to Malloy when 16 years old without her father's consent and this fact was a cause of worry to the senior Gernhart. She divorced Malloy and later married Reynolds which also displeased her father. The senior Gernhart first saw Clarence in the year 1907 when the boy was about 16 years of age and did not see

him again until he accompanied his mother to Sioux City in February, 1919 prior to the execution of the deed in question. Clarence had lived in many places and from a reading of the record one is impressed with the *"wanderlust"* of this young man since we find him in Dakota, Wyoming, Colorado, Oregon, Alaska and other places. We also find that he had used different names being known as Jack Allison at one time in Dakota and Charley Allen in Oregon and Washington. Although the visit of Mrs. Reynolds and her son Clarence to Sioux City in February, 1919 was at the instance and request of the senior Gernhart the fact of the visit was kept secret. Neither mother nor son visited or phoned the Campbell home or the William Gernhart home. The senior Gernhart demanded that Malloy change his name to Gernhart in order that the farm would be kept in the Gernhart name, but there was no condition attached in the deed.

During the last three or four years of Gernhart's life his physical appearance materially changed, as he lost weight and was physically much weaker. Gernhart's attorney, Mr. Neilan, who drafted the instrument testified that the fact that Malloy's name was being changed to Gernhart and that the old gentleman was deeding him the land and getting nothing for it impressed him as unusual.

It is also shown that in the spring of 1916 the son William at the earnest request and solicitation of his father sold his farm in Missouri, returned to Woodbury County and moved upon the land in question and occupied it until March 1st, 1919. The farm at that time was in poor condition and it was understood that William would not pay any rent the first year. William paid the taxes on the farm and made material improvements in buildings. In 1917 the father met his son William one day on the streets of Sioux City and without any provocation swore and cursed William, said he wasn't getting any rent, and wanted to know where he came in. Mrs. Mary Folan with whom he lived for a number of years and who was in a position to observe him closely testified that Gernhart always appeared very childish and as the years went by he became more childish and more feeble; that he was forgetful and would try to remember things and couldn't; that he would go out on the street

and pick up the ends of cigars, tie them on a string and hang them on a hot air pipe in his room; that he smoked them in his pipe; that when he was paid money he would put them in large bills of $100 to $500 and was like a child in handling it; that he had a hobby of sitting in his room in his underwear; that he had his money sewed in his underclothes; that he wouldn't give himself enough to eat, etc.

Space will not permit setting out all of the facts and statements of Gernhart as testified to by Mrs. Folan but all of her testimony points in one direction. Many witnesses who were in close relationship to him testified in detail as to facts upon which their opinion was based that he was of unsound mind.

Upon a careful reading of the record, of which but a small portion is recited herein, we are abundantly satisfied that the grantor of this deed at the time of its execution and for some time prior thereto was mentally incompetent. True no two cases involving the question of the instant case are bottomed on the same facts and consequently a court must apply the principles of common sense and human intelligence together with such legal principles as have found expression in the decided cases.

A court of equity will not leave the beaten pathway to sustain an instrument that is unconscionable and which deprives deserving children of their birthright. An instrument conceived in and born of the grantor's whims, vagaries and caprices which clearly show the absence of mental normalcy ought not to be sustained. No positive rule can be announced by which courts may determine the degree of the grantor's mental weakness or strength which will justify the setting aside or the sustaining of an instrument of conveyance. However, when it may be said from all the facts and circumstances that the particular act is unreasonable and unnatural and that the actor was not fully cognizant of the act and the consequences thereof a court should have no hesitation in setting it aside.

It is not necessary to establish complete mental incapacity on the part of the actor. The chancellor is entitled to take into consideration his physical condition, the adequacy of consideration, whether or not the conveyance is improvident, the relation of trust and confidence between the parties to the conveyance,

and the weakness of mind of the grantor as judged by his other acts within a reasonable time prior and subsequent to the act sought to be impeached.

In brief the determination of the absence or presence of sufficient mental capacity on the part of the grantor must be based upon the combined weight of all the evidence. It is composite and a court should consider and determine the ultimate proposition from every angle presented by the evidence. If all of the evidence and the reasonable inferences therefrom lead to the conclusion that the grantor is incompetent, and that he lacked sufficient reason to understand or appreciate the rightness of his act or the reasonableness and the consequences of his act, then it may be said that such person is mentally incompetent to do the thing against which complaint is lodged.

The conclusion reached by the trial court upon the submission of the cause is correct and the judgment and decree entered is therefore—*Affirmed.*

EVANS, C. J., WEAVER and PRESTON, JJ., concur.