CLARENCE ELSE, guardian of Sim Cundiff and Grace Cundiff, aged persons, appellees, v. FREMONT METHODIST CHURCH, appellant.

No. 48782.

(Reported in 73 N.W.2d 50)

NOVEMBER 15, 1955.

Ned P. Gilbert and Charles H. Scholz, both of Oskaloosa, for appellant.

Tunis H. Klein, of Pella, and Bray, Carson & McCoy, of Oskaloosa, for appellees.

LARSON, J.—This appeal involves an action in equity, brought by Clarence Else, guardian of Sim Cundiff and Grace Cundiff, against the defendant, Fremont Methodist Church, wherein the guardian sought to have his wards' deed conveying a remainder interest in the wards' 134-acre farm to the defendant-church, subject to a retained life estate in said wards, canceled and set aside, and title to the property quieted in the wards as against the defendant, upon the grounds that (1) said wards were without sufficient mental capacity to execute said deed and (2) said deed was obtained from said wards by the exercise of undue influence by the pastor and the chairman of the board of trustees of said defendant-church. The trial court found that the grantors lacked the requisite mental capacity and that their deed was

obtained by the exercise of undue influence, and entered a decree for the plaintiffs. The defendant appealed.

The questions involved on this appeal are (1) whether the appellees satisfied the burden of establishing the claimed lack of mental capacity (2) whether a confidential relationship existed of such nature as to cast upon the appellant any burden of proof with regard to the claim of undue influence, and if such burden was thereby cast upon the appellant, whether the appellant has met and satisfied that burden, and (3) whether any error was committed in excluding testimony of the grantors' attorney on the grounds of privilege.

Sim Cundiff and his wife, Grace, the grantors of the deed in controversy, were 73 and 76 years of age respectively at the time of the execution of the deed. They had been married for 40 years and no children were born as the issue of their marriage. Their only close relatives were Sim's one brother, and Grace's one sister. Sim had been a farmer all his life and he and Grace lived on and farmed a 120-acre farm located approximately two miles northwest of Fremont, Iowa. They also owned the real estate in controversy, said farm being triangular in shape, with public highways constituting the north and east boundaries of the farm and a railroad right of way the southwest boundary thereof. In addition, they owned some livestock, farm machinery, bank accounts and Government bonds, having a total value of approximately $30,000.

Grace had been a member of defendant-church many years, beginning with the time she was in high school and continuing until March 31, 1953, approximately six months after the deed in controversy was executed. She punctually attended church and was by her own statement a devout member. Sim Cundiff also attended this church, but did not become affiliated with it as a member until January 6, 1952.

Dr. Ernest A. Mathews, age 70, a Methodist Church minister since 1907, at the invitation of defendant-church, came out of retirement and accepted a call as its supply pastor. He arrived in Fremont in June 1951 and continued as such pastor until the summer of 1953. Upon arrival in Fremont, Doctor Mathews, seeking to become acquainted with his congregation, called at

the Cundiff home in July 1951 and became acquainted with Sim and Grace Cundiff. Thereafter until Sim sustained a cerebral hemorrhage on July 12, 1952, Doctor Mathews made further visits at the Cundiff home about once a month. A friendly relationship developed between them. On his second or third visit to the Cundiff home, in August or September 1951, he had a conversation with Sim in the farmyard during which Sim said, without solicitation from Doctor Mathews: "I want to give $20,000 to the building of a new church and it must be on the highway." Doctor Mathews commented that the offer was a very wonderful thought for him to keep in mind, and thanked him.

In December 1951, between Christmas and New Year's Day, Sim went to the bank with which he did business in Fremont and there delivered to his banker a check for $800 with the statement it was intended as a gift to the Fremont Methodist Church building fund, which check was subsequently turned over to the church treasurer. On Sunday, January 6, 1952, a ceremony for the reception of new members was conducted as part of the regular church service, at which time Sim received Holy Baptism and was received into the membership of the church. On this occasion Doctor Mathews made a public statement from the pulpit disclosing that a gift had been made to the building fund of the church by Mr. and Mrs. Cundiff. Without disclosing the exact amount, he stated that the gift was substantial. Soon after this Doctor Mathews and the church treasurer called at the Cundiff home to express the church's appreciation of the gift. On this occasion Sim stated the gift was "just a nest egg and he had another quarter." Doctor Mathews' public announcement was contrary to the Cundiffs' desire to avoid publicity, and later on, when the Cundiffs made a further gift of $400 to their church, they arranged that their tenant, Louis Meyers, mail his check for that amount to the church without any explanation that the Cundiffs were the actual donors, and for a time the church believed it was a gift from the tenant.

In the spring of 1952, following these gifts to the building fund, the church's trustees determined to canvass the church membership to ascertain whether there was any sentiment for the building of a new church building. In connection with this canvass, Doctor Mathews and W. O. McCurdy, chairman of the

board of trustees of the church, stopped at the Cundiff home to interview Sim. Concerning this visit Grace testified: "S. E. was so concerned, he told them on this committee, 'Let's build a church' ", but they informed him that the money was not available and the general congregation thought it was not feasible. Mrs. Cundiff also testified on one occasion during this period Sim said to her: " 'Grace, whenever we sell anything, if we have a little more than we need, we will put it on the building fund' ", and that there was similar talk for some months prior to the execution of the deed in controversy.

Later, on July 12, 1952, Sim suffered a cerebral hemorrhage which caused a partial paralysis of portions of his body and caused him to be confined to his bed for a period not definitely fixed by the record. Sim's physical condition improved as time went on and he was able to sit in a wheel chair, and later on was able to get on his hands and knees and crawl, and still later on was able to walk about by leaning and hanging on wires and other objects and without personal assistance from anyone. On September 28, 1952, four days after the deed was executed, Sim did walk from the barnyard to the house. Just before the deed was executed, he was able to be alone in the back yard of his home, exercising under the clothes line. Although his cerebral hemorrhage had affected his ability to talk plainly, he recognized his many visitors, was able to and did raise his hand in greeting, could answer questions by "yes" and "no" answers, and by signs and gestures was able to carry on conversations with his visitors and generally could make himself understood to them. His visitors included his neighbors, his farm tenants and their wives, several old family friends, his guardian, Clarence Else, and Mrs. Else, and Doctor Mathews, Mrs. Mathews, W. O. McCurdy, and W. O. McCurdy's daughter-in-law, Mildred McCurdy, most all of whom testified in this trial.

Mildred McCurdy, who moved to the Fremont community in 1949 upon her marriage to Leroy McCurdy, had never seen or heard of the Cundiffs until Sim's baptism on January 6, 1952, on which occasion Sim and Grace were identified as Mr. and Mrs. Cundiff. In March 1952 she became personally acquainted with

them. At Doctor Mathews' invitation she accompanied him and Mrs. Mathews to the Cundiff home for the purpose of playing her harp and singing religious hymns to Sim, she being an accomplished musician. Following this visit, Mildred's calls at the Cundiff home became more frequent and a closer friendship between Grace and Mildred developed after Sim's stroke, during the period from July 12 to September 24, 1952. Grace often called Mildred on the telephone urging her to come to their home, and she came to rely on Mildred to run errands for her, to bring her groceries from Fremont, and to do other similar favors for her.

During this same period Grace began to have difficulties with Sim's brother, Sam Cundiff. Sam's frequent visits to the Cundiff home disturbed and upset Sim, and Grace began to develop a feeling that Sam's motives were improper and he was endeavoring to become Sim's guardian. Sam's actions so dissatisfied her that on the evening of September 21, 1952, she sent her handyman, Archie Fuller, to Fremont to seek out Mildred Mc-Curdy for the purpose of soliciting her aid. Mildred informed Fuller that she was a short-time resident of Iowa, she was not familiar with the Iowa laws, and she therefore did not feel competent to advise or assist Grace. Later on that same evening she received a telephone call from Fuller from his home in Ottumwa. In this call he informed Mildred that he had stopped at the sheriff's office in Ottumwa to discuss the situation and had been advised by the sheriff it was a matter for the Mahaska County authorities, and Grace should seek the aid and assistance of the Mahaska County Attorney, Garold Heslinga. He also stated that the sheriff had suggested it would be well to check into Grace's mental condition. On the following morning, Monday, September 22, Mildred drove to the Cundiff home and informed Grace of Mr. Fuller's message and the procedure suggested by him. Grace then decided she would go to Oskaloosa where she would see and consult Doctor Voigt, who was the family physician and who then had Sim under his care, relative to her own mental condition and would seek the aid and assistance of Heslinga. She requested that Mildred take her there for those purposes. They departed for Oskaloosa about ten o'clock and arrived at Oskaloosa around eleven o'clock that same morning, with W. O.

McCurdy, Mildred's father-in-law, furnishing the transportation in his car. On the way to Oskaloosa Grace expressed a desire to avoid climbing any steps to the second-story office of the county attorney and suggested she would like to have W. O. McCurdy contact the county attorney and make an appointment to meet her at Doctor Voigt's office. Upon arrival at Doctor Voigt's office Mildred, Grace and W. O. McCurdy ascertained that Doctor Voigt would be unable to see them until 12:30 p.m. Thereupon Mildred and Grace left the office and went to a restaurant and ate lunch. Mr. McCurdy proceeded to Heslinga's office where he made arrangements to have Heslinga meet Mrs. Cundiff at Doctor Voigt's office at the appointed hour of 12:30 p.m. At that time Heslinga came to the doctor's office and found Mildred, W. O. and Grace in the waiting room. He visited with them briefly, at which time Grace informed him of her difficulties with Sam and her desire for Heslinga's assistance. In their discussion Heslinga alluded to the fact that Sam Cundiff was Sim's sole heir-at-law and inquired whether any arrangements had been made concerning the devolution of their property in the event of their deaths. Grace informed Heslinga that she and Sim owned all of their property in joint tenancy and that provisions had been made whereby the survivor of Grace and Sim would acquire all of the property. Heslinga then inquired as to whether provisions had been made as to who should succeed to the property upon the death of both of them. Upon being informed by Grace that no such provision had been made, Heslinga suggested that immediate arrangements should be made by Grace and Sim to plan their estates and in connection therewith to execute suitable wills. Grace agreed to this procedure and thereupon she, Heslinga, W. O., and Mildred proceeded into the doctor's conference room, where Grace's difficulties with Sam Cundiff were again explained and the doctor was requested to express an opinion as to Grace's mental condition, and also as to her and Sim's testamentary capacity. Doctor Voigt interrogated Grace at length concerning the members of her family, her relatives and the extent of her property, and in the presence of all four then stated he was of the opinion Grace was of sound mind, she had testamentary capacity, and knew what she was doing and the consequences of her acts. Later he signed and de-

livered to Heslinga a similar statement of his opinion concerning Grace's testamentary capacity. He also expressed an opinion that Sim Cundiff was then of sound mind and had testamentary capacity.

The four then retired from Doctor Voigt's office and proceeded to the parked McCurdy automobile. Mildred McCurdy departed on a shopping errand, leaving Heslinga, Grace Cundiff and W. O. McCurdy seated in the car. Heslinga and Grace conversed at length concerning the provisions of Grace's and Sim's proposed wills, and Heslinga made notes. It appears that he then informed Grace he would prepare the requested wills, and made an appointment to meet Grace and Sim at the Cundiff home at ten o'clock the following morning, September 23, 1952, to execute their wills. On the way home Grace told Mildred they were going to will 50% of their property to the Fremont Methodist Church.

Heslinga prepared wills for Sim and Grace, and on the following morning, September 23, 1952, he drove to Fremont in his car, where he contacted W. O. McCurdy and W. O.'s son, James McCurdy, and made arrangements for them to accompany him to the Cundiff home for the purpose of witnessing the execution of Grace and Sim Cundiff's wills. This same morning Grace Cundiff told Mrs. Clarence Else, wife of the plaintiff-guardian, she was making plans to execute her will and she desired to appoint Mrs. Else's husband, Clarence, as administrator of her estate. By the time Heslinga and W. O. and James McCurdy reached the Cundiff home that morning Clarence Else had responded to Mrs. Cundiff's message by coming to the house. Else and Louis Meyers, the farm tenant, were at the Cundiff home when Heslinga and the two McCurdys arrived. Heslinga went into the house and there had a conversation with Meyers and Else in which he informed them he had business to transact with the Cundiffs concerning their estate and requested them to leave. Else and Meyers then went outdoors and visited with the two McCurdy men while Heslinga conversed with the Cundiffs in the house. Upon retiring from the house Heslinga informed Else that Sim and Grace had not executed the wills he had brought with him, and there were certain changes to be made.

136

Heslinga and the two McCurdy men then left in Heslinga's car, and he returned to his law office in Oskaloosa where he prepared new wills incorporating the additional provisions and names of beneficiaries the Cundiffs desired named in their wills.

On the following morning, September 24, 1952, Heslinga again drove to Fremont in his car, picked up W. O. and James McCurdy as witnesses, and went to the Cundiff home for the purpose of having the Cundiff wills executed. Grace's will was read aloud and she then executed it and it was witnessed by the two McCurdy men. The prepared draft of Sim's will, Exhibit D-4, the provisions of which were similar to the will signed by Grace, was then read to Sim down to and including paragraph 3 thereof. At that point Sim indicated his dissatisfaction with its terms and pushed the will aside. He then indicated by sound and motion his desire to obtain some object lying upon the kitchen table, which was a piece of paper then on the table. This piece of paper was cut in a triangular shape. Those present endeavored to ascertain Sim's desires and the meaning of the paper. After extended questioning in which Sim could not make himself understood, Sim got out of his wheel chair, down onto the floor, and grabbing the leg of Heslinga's trousers and crawling on his hands and knees led Heslinga, Grace and the others outdoors to Heslinga's car and by motions indicated his desire to take a ride. They got into the car and Heslinga drove the car in the direction indicated by Sim. He directed them south along the highway, past the crossroads to the railroad crossing at the southeast corner of the tenant farm, then back to the crossroads and west to the tenant house. They then proceeded west in the car to the railroad crossing at the northwest corner of the farm, then turned around and returned to the crossroads and then north to the Cundiff home. Upon their return Mrs. Cundiff suggested to all of them that the paper was in the shape of the tenant farm and perhaps it was intended to represent the farm. Heslinga then inquired of Sim whether he was trying to tell him something about the farm, and Sim, by word and by motion of his head, indicated he was. Then, through questions propounded by Heslinga and answers made by Sim, Sim indicated he wished to make a gift of the farm to the church, not by a will, but by a deed in which a life estate was to be retained by Sim and Grace. Heslinga ex-

plained the tax problems involved in such a transaction and the legal implications of a will as distinguished from a deed to be presently delivered. Heslinga told Mrs. Cundiff and Sim that a will could always be torn up and revoked but that a deed was final and could never be changed or revoked.

Informing the Cundiffs that he would prepare such a deed and return to their home later on that day for its execution, Heslinga, W. O. and James McCurdy returned to Fremont. Heslinga obtained a blank deed form and a plat book from the Fremont Bank and after determining the correct legal description of the real estate involved, he prepared the deed on a borrowed typewriter. He ate his lunch alone at a café in Fremont and then returned to the Cundiff home. W. O. McCurdy again went with him.

It appears during Heslinga's absence Grace Cundiff telephoned Mrs. Mathews and said to her: "I've a very happy surprise for you and Doctor Mathews. I want you to come right on out to our place." Dr. and Mrs. Mathews responded to this request by immediately driving out to the Cundiff home in their automobile. Upon their arrival at the Cundiff home Grace did not immediately reveal to them the plan to make a gift of the farm to the church. When Heslinga arrived, he informed Doctor Mathews he had some business to transact with the Cundiffs which concerned the church and he did not wish them to be present. Grace then joined Heslinga and Sim in the back yard while Dr. and Mrs. Mathews remained in the front yard and W. O. McCurdy went to the porch of the house. Heslinga then read the deed in full, including the acknowledgment certificate, to Grace and Sim. The deed was then executed by Grace and Sim, and Heslinga completed the acknowledgment form in his capacity as a notary public. Heslinga then called Dr. and Mrs. Mathews and W. O. McCurdy into the back yard and there, in the presence of Sim and Grace, informed all those present that Sim and Grace had just made a gift of their tenant farm to the church, by deeding it to the church. The deed was then handed by Heslinga to W. O. McCurdy. W. O. McCurdy and Doctor Mathews, on behalf of the church, expressed their very great appreciation for the gift and Doctor Mathews offered

prayer in thanks. McCurdy then handed the deed to Heslinga and instructed him to take it to Oskaloosa to be recorded. There is a dispute as to whether Sim or Grace voiced or indicated any objection to the recording or publishing of the deed. However, the following day Mr. Heslinga did send the deed to the Mahaska County Recorder for recording.

Upon being informed that his bill was $13, Grace prepared a check in that amount and handed it to Heslinga before he left for Oskaloosa. No one else paid Heslinga for these services. It further appears that Heslinga at no time ever represented or acted as attorney for the Fremont Methodist Church, Doctor Mathews, any of the McCurdys or the partnership which is known as the McCurdy Seed Company.

On the day after the execution of the deed, September 25, Mildred McCurdy was at the Cundiff home and Mrs. Cundiff told her: "We deeded this other farm to the Church. It was all Sim's idea." At that time she showed Mildred the triangular piece of paper, and told her Sim had cut it out.

A birthday-wedding anniversary party was held at the Cundiff home on September 28. Subsequent to that date, and on September 30, the Oskaloosa Herald published a list of all deeds which had been recorded recently in the County Recorder's office, including the Cundiff deed to defendant-church. Prior thereto Grace told Louis Meyers, their tenant, about the execution of the deed, but at the party there was no reference to the execution of the deed and no complaint was made concerning its execution.

It was following the recording of the deed and talks with various persons that Grace made complaint concerning its execution and delivery. The minister first heard of this change of heart when she called him on the telephone and threatened to "close the doors of the Church" unless they returned the conveyance. Thereafter Louis Meyers took Grace to Heslinga's office to solicit his aid in helping her obtain the return of the deed, and when he declined to help her, Meyers took her to the office of another lawyer, John Sproatt, to consult with him concerning the deed.

There is little controversy in the case as to the applicable law, and the correct result rests largely upon an accurate determination and application of the facts involved.

■■ I. One of appellant's contentions is that the trial court erred in finding from the disclosed facts that a confidential relationship existed between Doctor Mathews and W. O. McCurdy, chairman of the church board of trustees, on one hand, and Sim and Grace Cundiff on the other hand, thereby putting the burden upon appellant to justify the deed. As usual in cases of this nature this question lies at the threshold of a proper determination of the lawsuit. The record, as voluminous as it is, contains little direct evidence bearing on the subject. True, there was the relationship of clergyman and parishioner, but it is well settled that such relationship alone is not conclusive of a confidential relationship. Coughlin v. St. Patrick's Church, 201 Iowa 1268, 203 N.W. 812, 209 N.W. 426; Humphrey v. Norwood, 213 Iowa 912, 918, 240 N.W. 232; Roller v. Roller, 201 Iowa 1077, 1082, 203 N.W. 41; Stonewall v. Danielson, 204 Iowa 1367, 1370, 217 N.W. 456; O'Neil v. Morrison, 211 Iowa 416, 233 N.W. 708. Indeed few relationships in name only do carry such import, but the true test has been set forth in several of our cases and reaffirmed as late as our past session. See Dibel v. Meredith, 233 Iowa 545, 549, 10 N.W.2d 28; Merritt v. Easterly, 226 Iowa 514, 284 N.W. 397; Knigge v. Dencker, 246 Iowa 1387, 72 N.W.2d 494. The object back of the rule is to prevent one standing in a confidential relationship with another from gaining an advantage in a transaction with the cestui que trust, which may reasonably be the result of the confidence reposed. Thus before one is allowed to retain the advantages of the transaction, he must show that the cestui acted with freedom, intelligence and full knowledge of all the facts. Utterback v. Hollingsworth, 208 Iowa 300, 225 N.W. 419, and cases cited therein.

■■ Usually the burden is on one seeking to set aside a deed upon the grounds of mental incapacity and undue influence such as we have here, and he is required to prove the allegations, not by a mere preponderance of the evidence, but by clear, satisfactory and convincing evidence. Merritt v. Easterly, supra, 226 Iowa 514, 516, 284 N.W. 397; Crawford v. Raible, 206 Iowa 732,

745, 221 N.W. 474; Foster v. Foster, 223 Iowa 455, 457, 273 N.W. 165. It should therefore be necessary for one alleging a confidential relationship so as to raise a presumption that transactions between the parties are improper or fraudulent, and shift the burden of proving that the cestui acted freely and with full knowledge of all the facts, to prove that relationship in a clear and convincing manner. Popejoy v. Eastburn, 241 Iowa 747, 757, 41 N.W.2d 764. Some little confusion has resulted in the consideration of most any friendly relationship as a showing of confidential relationship, but far more is necessary. Evidence must be produced to show how and in what manner the alleged trust was reposed, and how the dominance was exercised. The facts giving rise to the relationship, the showing that the one party was actually in a position of dominance or superiority, and the cestui in a corresponding position of inferiority or subservience, the strength of will of one and weakness of the other, the intimate character of their relation, and the facts showing the manner in which trusts and confidences had been reposed in the dominant party, must appear. In other words, this relationship should be clearly shown and not left to conjecture.

We think here the trial court fell into error by assuming, because of the religious nature of the relationship, it was a confidential relationship. This may be a considered factor but is far from conclusive and the ultimate confidential relationship presumed. The trusts, confidences, reliance, dominance, and subversion must be shown.

Judge Mantz, speaking for our court in Dibel v. Meredith, supra, 233 Iowa at page 551, page 31 of 10 N.W.2d, clarified the meaning of confidential relationship as follows: "It was the holding in the cited case [Merritt v. Easterly], based upon authority, that a confidential relationship arises where one person gains the confidence of another and purports to act and advise with the other's interest in mind."

He also had this to say in the same case at page 549 of 233 Iowa, page 30 of 10 N.W.2d: "A confidential relationship arises whenever a continuous trust is reposed by one person in the skill and integrity of another, and so it has been said that all the variety of relations in which dominion may be exercised by one person fall within the general term 'confidential relation.'"

(Citing 15 C. J. S. 822; Pomeroy's Equity Jurisprudence, 3d Ed., section 956.)

Judge Bliss pointed out in the case of Merritt v. Easterly, supra, 226 Iowa 514, 284 N.W. 397, some of the acts and circumstances under which a presumption of confidential relationship properly exists. From a careful reading of that case it is quite evident the defendant here was not shown exercising such a dominance or relationship toward the grantors. In that case the grantee took a deed from the grantor on March 3, 1937, which was alleged to be a gift. In November 1935 grantee had moved in grantor's home and thereafter took complete charge of her affairs and attended to every detail. He took charge of her bank account and check book, made all deposits and withdrawals. The evidence disclosed he did many other things purportedly with her "interest in mind." It was pointed out therein this court had no intention of fettering the operation of the principles which have been consistently followed by this and other courts in cases involving the correct and just presumption arising from confidential relationships by undertaking to define the term or give the precise limits thereof. Nevertheless we find therein an excellent discussion of the subject and a rather clear explanation of the elements required to be proven to establish this relationship. It is just and proper to so protect weak, incompetent and trusting persons from the fraudulent efforts of unscrupulous persons, but it is also necessary, we think, to show first how and in what manner that trust was reposed and how the dominance was exercised. In that respect the plaintiffs here have utterly failed.

Except for the opportunity to exercise these influences, the evidence discloses no such relationship. We cannot say the usual pastoral visits at the Cundiff home by the minister and his wife, or an occasional call by the chairman of the church board of trustees, who was also the lay leader of this little 100-member church, especially after Sim's illness, can give rise to such an inference. There was no showing these men ever told the Cundiffs what to do, nor were they consulted about any business matters. It is true Mrs. Cundiff said, in answer to a leading

question, they consulted about religious and business matters. Her testimony was as follows:

"Q. Did you place trust and confidence in Mr. Mathews? A. Yes, sir. We sure did. Q. Also Mr. McCurdy? A. We sure did. I thought he was a Christian man. * * * Q. Did they discuss religious matters with you? A. Oh, yes. Q. And some business matters? A. Yes. But I didn't always know about that, that would be in the back yard."

But no further details were related. These were important, if true, to establish the alleged relationship, and without evidence thereof, it is of little value to the court.

It is most difficult to find any evidence of the demands or dominance of this minister or Mr. McCurdy, or the subservience of the Cundiffs. They handled no business matters for the Cundiffs and, except for pleasant social relations, we find no evidence of dependence upon them. As a matter of fact, the Cundiffs seemed to be the ones who did the demanding, and these church people, including the daughter-in-law of Mr. McCurdy, a talented musician, and other neighbors and friends, went out of their way to be kind to them and do acts of servitude, especially after Sim's illness. See O'Neil v. Morrison, supra, 211 Iowa 416, 233 N. W. 708.

The fact that McCurdy and his daughter-in-law provided transportation to Oskaloosa on September 22 at the request of Mrs. Cundiff does not infer a relationship of dominance over her or her husband. There is nothing at all in this record to show the grantors reposed any special faith and confidence in any suggestions of McCurdy or the minister, certainly not to the extent that they sacrificed their own ideas to those of the church officers. Indeed the evidence disclosed complete independent thinking for themselves, for Mrs. Cundiff wanted a will drawn to her liking, and Mr. Cundiff did not want a will but a deed to his liking. Not once does it appear that the minister or McCurdy offered even a suggestion, to say nothing of a demand for a deed or a specific provision or a bequest in the wills for the benefit of the church. We cannot infer from their opportunity or even their disposition to do so that they did so, and thus relieve the parties who would set aside the deed from proving by clear,

satisfactory and convincing evidence that its execution and delivery was obtained by undue influence, fraud, or due to the mental incompetency of the grantors. Their relationship was not shown to be any more pronounced than that of many other friends and neighbors who frequently came in to assist at the time of Mr. Cundiff's illness and convalescence. We conclude therefore plaintiffs have failed to prove the alleged trust, confidence, reliance or dominance required to establish the confidential relationship alleged.

II. The trial court found the defendant did not sustain the burden of proof imposed by law on it to show no unfair advantage was taken of the Cundiffs in the transaction. This conclusion, due to our difference with the trial court in Division I hereof, is therefore also in error. It was not defendant's burden, for we determined the alleged confidential relationship had not been established. Therefore, the burden remained upon the plaintiffs to prove undue influence by clear, satisfactory and convincing evidence. Merritt v. Easterly, supra, 226 Iowa 514, 516, 284 N.W. 397; Mastain v. Butschy, 224 Iowa 68, 84, 276 N.W. 79.

The expression of this court found in In re Estate of Mott, 200 Iowa 948, 949, 205 N.W. 770, approved in Worth v. Pierson, 208 Iowa 353, 359, 223 N.W. 752, and Arndt v. Lapel, 214 Iowa 594, 603, 243 N.W. 605, 609, is as follows: "Influence, to be undue, within the meaning of the law, must be such as to substitute the will of the person exercising the influence for that of the testator, thereby making the writing express, not the purpose and intent of the testator, but that of the person exercising the undue influence. It must be equivalent to moral coercion, must operate at the very time the will is made, and must dominate and control the making of it [citing many cases]. * * * Undue influence is not established by proof of opportunity to exercise it. Importunity, request, and persuasion that do not go to the point of controlling the will of the testator are not enough, nor is it established by proof of opportunity and disposition so to do [citing cases]. * * * Contestants must go further than this, and show not only the existence of the facts, but that said undue influence existed, and controlled the maker of the instrument in the disposition he made of his property, sub-

stituting the will of the person exercising the influence for the will of the person making the writing."

Also see Knigge v. Dencker, recently handed down by this court and written by Justice Thompson, 246 Iowa 1387, 72 N.W.2d 494, and cases cited therein.

As to the law of undue influence, little further need be said. Relationship of the parties, improvidence of the gift, activities of beneficiaries, and weakened mental condition might under some circumstances become important. It is manifest to us that under the record these elements did not control, and what we said as to the failure to prove facts that would give rise to a confidential relationship also applies here. See Osborn v. Fry, 202 Iowa 129, 209 N.W. 303; Humphrey v. Norwood, supra, 213 Iowa 912, 918, 240 N.W. 232. Although the burden of proof was not upon it, we think defendant has shown good faith in its relationship with the Cundiffs. There is no showing it interfered or tried to interfere with the wishes or decisions of either Grace or Sim Cundiff.

It will be recalled Grace gave detailed instructions as to how she wished her will drawn and the attorney took notes on two occasions in order to incorporate therein the specific bequests desired by her. There is no contention McCurdy, who was present the first time, made even a suggestion. It was her desire that both prepared wills, hers and Sim's, provide that 50% of the balance left after both were deceased should go to the church building fund. There is no contention that after her will was so prepared she did not sign it in the presence of witnesses, or that Sim did not refuse to sign his will, and in doing so indicated he had other ideas about the tenant farm. When questioned by their attorney at that time, it developed Sim wished to deed that farm to the church rather than will 50% of all their remainder. When the legal implications of such a transfer were explained to him by the attorney, in her presence and in the presence of others, Sim signified that was his desire, and the deed was prepared. Rather than a straight deed, it provided for a life estate in Sim and Grace Cundiff and was executed and delivered in the afternoon of September 24, 1952.

We have carefully reviewed the record and find nowhere even the slightest indication that the will of either the minister or the board chairman was substituted for that of Sim or Grace Cundiff. As heretofore pointed out, if kindness or willingness to help these good people could supply that fact, then all the neighbors thereabout, including their tenants and their present guardian, must be viewed with suspicion, for they also called on the Cundiffs frequently after Sim's stroke and offered help and assistance. No doubt there was a feeling of gratitude toward all these people by the Cundiffs, but clearly we cannot infer thereby a dominance over Sim and Grace. They too, or most of them, were listed as beneficiaries under the prepared wills. But as previously pointed out, even if all these parties had tried to persuade the action of the Cundiffs, that would not have been sufficient, for the law requires a clear and convincing showing that the grantor's will was not his own but that of the party benefited by the instrument, to constitute the exercise of undue influence. Clearly then, the fact that several months before the illness of Sim, the minister and the board chairman had stopped to solicit church funds and report on a canvass to determine the feasibility of a church building program, did not furnish the basis of a superimposed will causing the execution of the deed.

True, there was no consideration for the deed, but clearly none was intended, for it was a gift in contemplation of death. It can scarcely be called an improvident gift, for besides having the life use of the property, the Cundiffs still had a farm of about the same size and about $30,000 in cash and bonds. They had no children, and there were only a brother of Sim's, whom Grace did not like but feared, and a sister of Grace's, who seemed to be of no interest to Grace.

As a matter of fact, it rather clearly appears the Cundiffs wished to do for the church. They had, before Sim's illness, given $800 at one time and $400 at another through a tenant. They wanted a new church built. Defendant contends, with some merit, it was the publicity they received due to the recording of the deed that caused the trouble. Whether it was that or the comments of their neighbors, it is evident they did change their minds. Even though they were warned by their lawyer at the time of the execution as to the import of a deed, they never-

theless now apparently wish to otherwise dispose of that property. Mrs. Cundiff testified that when she signed the deed, she knew it was a deed, and that before she signed it Heslinga said: " 'Mrs. Cundiff, if you sign a will, you can just tear it up, but you couldn't do a deed that way,' " and " 'Mrs. Cundiff, after you sign a will, you can have it changed, but you can't do a deed that way.' " She also testified that the deed "was Sim's idea" and that she signed it to please Sim. It is now too late to change their minds, for deeds may not be so easily upset. It was grantors' desire then, and if either of them thereafter became unsound of mind, who can say their desire thereafter is the right one? Sim suffered with arteriosclerosis, and how far that malady had developed does not appear. It is well known that it is a progressive disease and it is quite possible that he soon thereafter reached the stage where his mind was unsound. Clearly after that his will could not be determined.

We find support for this conclusion in Leonard v. Leonard, 234 Iowa 421, 428, 12 N.W.2d 899, 902, where we said: "In order to set aside a deed such as the one in the present case the burden is upon the plaintiff to establish by clear, satisfactory, and convincing testimony that the grantor at the time he signed it did not understand in any reasonable manner the nature of the particular transaction in which he was engaged and the consequences and effects upon his rights and interests. Foster v. Foster, 223 Iowa 455, 273 N.W. 165, and cases cited; * * *. The courts have uniformly upheld the right of every person to dispose of his property freely and in accordance with his wishes and have refused to permit such right to be disturbed without strong proof. * * * Our decisions uniformly hold that to set aside an instrument on the ground of undue influence there must be such persuasion as results in overpowering the will of a person or prevents him from acting intelligently, understandingly, and voluntarily—such influence as destroys the free agency of the grantor and substitutes the will of another person for his own." (Citing Osborn v. Fry, 202 Iowa 129, 209 N.W. 303, and Gates v. Cole, 137 Iowa 613, 115 N.W. 236.)

Only by sheer conjecture could it be found here there existed any basis for a finding that the will of the grantor had been superimposed for nowhere do we find any testimony that

anyone suggested that the Cundiffs deed the triangular or tenant farm to the church. Mrs. Cundiff herself said it was all Sim's idea.

Then too, undue influence must operate at the very time the instrument is executed. In re Estate of Brooks, 229 Iowa 485, 493, 294 N.W. 735; In re Estate of Eiker, 233 Iowa 315, 317, 6 N.W.2d 318.

The rule was well announced in In re Estate of Hollis, 234 Iowa 761, 769, 12 N.W.2d 576, 581, where we said: "Undue influence, although of course it may be proven by circumstantial evidence, must. be such as to substitute the will of the person exercising it for that of the testator, thereby making the writing express the purpose and intent of such person, not of the testator. It must be equivalent to moral coercion. It must operate at the very time the will is made and dominate and control its making. It is not established by proof of opportunity and disposition to exercise it. Importunity, request, and persuasion that do not control the will are not enough [citing cases]."

Also see Campbell v. Hale, 233 Iowa 264, 6 N.W.2d 128, for effect of available opportunity for independent advice.

It is interesting to note, in regard to Grace Cundiff's declarations as to her intent on the execution of the deed, this pronouncement in In re Estate of Eiker, supra, at page 317 of 233 Iowa, page 320 of 6 N.W.2d: "We have uniformly held that the fact of the exercise of undue influence cannot be established by proof of declarations of the testator made before or after the execution of the will, such declarations not being substantive evidence of undue influence. There must be some substantive evidence of the exercise of undue influence before declarations may be considered."

Reasonable limits of an opinion do not permit a discussion of all the contentions relating to undue influence. However, we conclude there was insufficient clear, satisfactory and convincing proof of undue influence exercised by defendant in procuring the deed.

III. Perhaps plaintiffs' principal contention is that both Sim Cundiff and his wife, Grace, did not have mental ca-

pacity to execute the deed and did not know or realize the import of their act. Such contention likewise demands of plaintiffs clear, satisfactory and convincing evidence. We find no merit in the contention as to Grace Cundiff. The most persuasive evidence produced as to her mental capacity was from her own doctor, Doctor Voigt, who said, after an examination of her two days before the deed was signed, that she was mentally competent to execute such instruments. Grace said she was nervous, distracted and mentally disturbed due to Sim's illness, and though she knew she was signing a deed, and its import, she was doing it to humor Sim and did not think it would amount to any actual transfer. Several friends and neighbors testified she appeared distraught and mentally disturbed after Sim's illness, but none said she was of unsound mind. Mere mental weakness in a grantor is not grounds to invalidate a deed.

In Nowlen v. Nowlen, 122 Iowa 541, 546, 98 N.W. 383, 384, we said: "Mere mental weakness in a grantor will not invalidate a deed. To have that effect, the mental powers must be so far deteriorated or destroyed that the grantor is incapable of understanding in a reasonable degree the nature and consequences of the instrument he executes."

Also see Paulus v. Reed, 121 Iowa 224, 96 N.W. 757; Gernhart v. Gernhart, 194 Iowa 487, 185 N.W. 483.

Plaintiffs' witnesses said Grace was "worked up like anyone would be", and "Grace appeared to be very distraught and worked up" due to Sim's stroke and physical disability. Doctor McNichols, called by plaintiffs, did not express an opinion as to her mental soundness. We think there is no question that she had the mental capacity to execute the deed on September 24, 1952, knew exactly what she was doing, and knew the consequences of the act. She said she knew it was a deed, but thought it was all being done to please Sim and therefore meant nothing; in other words, was all a hoax upon her unfortunate spouse. We doubt that story.

As to Sim, the evidence, though somewhat stronger, is still insufficient to satisfy us he was of unsound mind or did not know what he was doing on the date the deed was executed, or that he did not have the ability to comprehend and understand the nature of his act and its consequences. See 26 C. J. S., Deeds,

section 54, page 264, note 95. Mere weakness of mind or periods of unsoundness of mind in or about that time are not sufficient proof of mental incapacity to execute a deed if at the time of its execution it clearly appears one has the capacity to comprehend and understand the nature of his act and its consequences. Nowlen v. Nowlen, supra; Altig v. Altig, 137 Iowa 420, 423, 114 N.W. 1056; Cavanagh v. O'Connor, 186 Iowa 257, 264, 169 N.W. 747; Coughlin v. St. Patrick's Church and Leonard v. Leonard, both supra; Keune v. McCauley, 228 Iowa 607, 609, 293 N.W. 25.

Here too plaintiffs offered no testimony as to Sim's actual mental condition on the day the deed was executed. An expert witness, Doctor McNichols, produced by plaintiffs, freely admitted that one suffering from the ailment such as Sim had, might possibly have subsequent sane or lucid intervals, though a permanent recovery was not possible. It is true Doctor Campbell, a physician who examined him some months later, found him to be of unsound mind, and said in his opinion that condition existed at the time of the conveyance. But on the other hand, Doctor McNichols, who attended Sim at the time of the stroke in July 1952 said it was not too severe and he would improve both physically and mentally sixty or ninety days thereafter. On the day of the stroke Doctor McNichols considered him of unsound mind, but did not examine him thereafter and did not know whether he was of sound or unsound mind on September 24, 1952. However, from his experience with like cases, the greater percentage of cases did not result in the patient's loss of a sound mind. "They are of sound mind following a stroke such as Sim Cundiff sustained", he said.

There was the usual testimony of nonexperts as to Sim's mind, and the tenor of those opinions was that, although he knew and recognized them, because he had a blank expression on his face, could only talk or make himself understood with difficulty, mostly answering questions with yes or no, could walk very little and did not show too much interest in things about him, he was of unsound mind, at least at times; also that he was forgetful. They are not very helpful, nor are the facts upon which these witnesses based their opinions as to Sim's mental soundness. See Olson v. Olson, 242 Iowa 192, 204, 46 N.W.2d 1. None testified as to the state of his mind on September 24, 1952,

the day the instrument was signed. On the other hand, Doctor Voigt, Sim's physician of several years past, expressed the opinion to the Cundiffs' attorney, Mr. Heslinga, two days before the deed was signed that he thought Sim of sound mind and able to execute a legal document.

The undisputed testimony that Sim rejected the will Grace had drawn for him and in a rather ingenious manner indicated the land he wished to deed to the church instead, and the answers given to Attorney Heslinga when he inquired as to Sim's desire, seems to lead to the conclusion he did at that time have the capacity to comprehend and to understand the nature of his act and its consequences. Even Grace said "It was all Sim's idea." As a matter of fact it was a gift which probably would be less than 50% of the remainder after Grace and Sim died, and reasonably could be expected to result in lower court costs in realization. It disclosed a rational decision, if they desired to give a substantial gift to the church.

We fail to find in these undenied transactions any clear or convincing evidence of undue influence or mental incapacity of either party, and therefore plaintiffs' contentions that such existed at or near the time of the deed's execution must fail.

It may be conceded that weakened mental condition such as Sim Cundiff suffered is a factor to be considered, but here he was attended by his wife, Grace, and his attorney, Heslinga, and only by them at the time of the execution of the deed. It must be concluded they would not have permitted him to sign the deed if they had not been convinced he knew what he wanted, what he was doing. They were his helpers and were in a position to give him independent advice or the guidance he might desire. Merritt v. Easterly, supra, at page 528 of 226 Iowa, page 404 of 284 N.W. Even from plaintiffs' evidence it satisfactorily appears that on September 24, 1952, the grantors intended the deed to the land in controversy should be delivered to defendant herein.

It would unduly extend this opinion, already too long, to comment at length upon all the testimony and conflicting evidence on Sim's mental soundness, so we say upon the whole record plaintiffs have failed to show by clear, satisfactory and

convincing evidence that Sim and Grace were so mentally incompetent at the time the deed was made that they did not know what they were doing or understand the consequences of their act.

We are supported by a host of cases, among which are: Merritt v. Easterly, supra, 226 Iowa 514, 516, 284 N.W. 397; Crawford v. Raible, supra, 206 Iowa 732, 745, 221 N.W. 474; Keating v. Augustine, 213 Iowa 1336, 1347, 241 N.W. 429; Foster v. Foster, supra, 223 Iowa 455, 457, 273 N.W. 165. Furthermore there is a strong presumption in favor of the grantors' mental competency. Evers v. Webb, 186 Iowa 1172, 1178, 173 N.W. 264; Wilson v. Wilson, 240 Iowa 26, 34 N.W.2d 911.

In Coughlin v. St. Patrick's Church, supra, 201 Iowa 1268, 1280, 203 N.W. 812, 209 N.W. 426, 427, we said: "While the case is close on the fact question of mental competency—more so than on the question of undue influence—we are of the opinion that, at the time of the execution of the conveyances, the grantor was possessed of such mental capacity as enabled him, in law, to execute the deeds in question."

Perhaps the most significant fact on the issue of mental capacity is the apparent willingness of Grace to permit Sim to sign the deed and to join him in doing so, and the fact that Sim's own attorney, Garold Heslinga, permitted him to execute the deed after consulting with Sim's own physician, Doctor Voigt, relative to Grace's and Sim's mental condition. These facts are quite persuasive of the regularity of this transaction.

IV. In arriving at a conclusion different from that of the trial court we are aware that we have said many times we give serious consideration to the findings of that court because it saw and heard the witnesses. However, we are not bound by its finding, especially in matters like the one at hand where the law is not in dispute and the witnesses who testified to various facts were apparently attempting to tell the truth. There appears to be no serious question of credibility or veracity which should be left to the trial court's better determination. We must, we think, determine for ourselves whether the case has been established by clear, satisfactory and convincing evidence. Of course this matter is reviewable de novo. Peddicord v. Peddicord, 242 Iowa 555, 47 N.W.2d 264.

It is here not a question whether these witnesses have an honest and abiding conviction as to their express opinions on the mental capacity of the parties, but whether the facts they relate are sufficient to support such opinions and convince the court of their correctness. Those opinions are not controlling. They did not refer to the time the deed was made, and some of them did not express the belief Sim was at all times unable to know what he was doing or what was going on. Quite the contrary, he knew most of them at all times and conversed with them the best he could with his speech defect. We attach little significance to the fact he sometimes tried to put a lighted end of a cigar in his mouth, and on one occasion started to wash his feet with his socks on. Many sane old men are just that forgetful. At the most these incidents could disclose only a weakness of mind and body or a forgetfulness common to people of his age, and not a condition which disclosed an inability to know or understand the nature of his acts and their consequences.

We must therefore differ with the conclusions of the able trial court in this matter.

V. We should not conclude this opinion without some comment upon the unfortunate reflection cast upon Mr. Heslinga, the attorney who was drawn into this controversy by being employed by Mrs. Cundiff. We are convinced he served only the Cundiffs. They alone paid him for his services. As the attorney for the Cundiffs we are convinced he furnished them independent, good and correct legal advice, and nothing is shown to substantiate a charge that he conspired to aid the church obtain the deed in controversy. He received only $13 for his services, which consisted of a conference in Oskaloosa and two trips to the Cundiff home near Fremont, plus the preparation of four wills and a deed. The only possible mistake he made was to assume the Cundiffs wanted their friend Mr. McCurdy as a witness to the wills and took him and his son along for that purpose. However, there is not the slightest indication he was acting for the minister, Mr. McCurdy or anyone but the Cundiffs. It is suggested the neighbors could have been used as witnesses, but it does not appear the attorney personally knew them or that they may have been desired by the Cundiffs.

VI. Defendant's counterclaim, which prayed that its title to the real estate be quieted subject only to the life estate of Sim and Grace Cundiff, should be upheld. The trial court's dismissal of the counterclaim, as well as its cancellation of the deed, must therefore be reversed.

Reversed and remanded for decree in accordance with this opinion.—Reversed and remanded.

All JUSTICES concur except OLIVER, C. J., and PETERSON, J., who take no part.